**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 8, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RAJEANNA DIXON,

        Plaintiff-Appellee,

v.

CATHY KIRKPATRICK, in her
individual capacity,

        Defendant-Appellant,

OKLAHOMA BOARD OF
VETERINARY MEDICAL
EXAMINERS,

        Defendant.

No. 07-6201

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 06-CV-1003-M)**

---

Jami J. Fenner, Lester, Loving & Davies, P.C., Edmond, Oklahoma, for Plaintiff-Appellee.

M. Daniel Weitman, Assistant Attorney General (Kindanne C. Jones, with him on the brief), Oklahoma City, Oklahoma, for Defendant-Appellant.

---

Before **MURPHY, McKAY** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Rajeanna Dixon, an investigative assistant for the Oklahoma Board of Veterinary and Medical Examiners ("OBVME"), lost her job partly because she discussed OBVME's investigation of a dogfighting ring with a member of the veterinarian trade association. She brought a § 1983 action against OBVME and her supervisor, Cathy Kirkpatrick, alleging that she had been fired in violation of her constitutional right to free speech. Ms. Kirkpatrick and OBVME moved for summary judgment; Ms. Kirkpatrick claimed she was entitled to qualified immunity. The district court denied their motion, and Ms. Kirkpatrick, individually, now appeals the denial of qualified immunity. We reverse the district court on the ground that an investigative agency is within its rights as an employer to discipline an employee with access to confidential materials for discussing details of an agency investigation with an outside party.

## I. BACKGROUND

The OBVME is the agency charged under Oklahoma law with regulating the practice of veterinary medicine in the State. 59 Okla. Stat. § 698.3. Defendant-Appellant Cathy Kirkpatrick is its Executive Director. During the relevant period, OBVME had four employees, one of whom was Plaintiff-Appellee Raejeanna Dixon. As an "investigative assistant," Ms. Dixon's job was to assist the Board's investigator, Dale Fullerton, with "clerical and inspection duties" by typing reports, documents, and transcripts for investigations. Some of

her job duties entailed access to confidential materials, including information concerning ongoing investigations. Although there is no evidence of a written confidentiality policy applicable to Ms. Dixon's position,[1] both Ms. Dixon and her employers later testified that Ms. Dixon was not supposed to divulge information about ongoing investigations to outside parties. The following is an excerpt from Ms. Dixon's deposition:

Q. Do you believe that the board did not want its employees to disclose information to anyone outside of the office regarding an investigation?

A. Yes.

Q. Okay. Was it common knowledge that employees were not to discuss information regarding investigations conducted by board employees with those outside the office?

A. Well, they were discussed with our AG representative [i.e., the agency's attorney].

* * * * *

Q. What about outside of [the AG representative], do you think the board wanted its employees to discuss investigation information with anyone else outside the agency?

_____

[1] The appellant points to a statutory policy prohibiting OBVME employees from disclosing information about ongoing investigations, stating that it was adopted by the OBVME board in January, 2004. Appellant's Br. 3. The record, however, indicates that in January 2004 the Board voted to recommend this statutory change to the legislature; the change was not enacted until November, 2004. It was therefore not applicable at the time of Ms. Dixon's actions or termination. In any event, this policy was addressed to the agency as a whole, and was designed to change the agency's practices regarding inquiries about veterinarians who were undergoing investigation.

[Objection to the form of the question.]

A. Yes.

Q. You said yes. You believe that the board wanted you to discuss investigation information with people outside the agency?

A. No.

R. 81–82. The chairman of OBVME stated that an employee in Ms. Dixon's position "should [not] be talking . . . about investigations that are going on," and that "any conversation about investigations is too much." R. 409. Ms. Kirkpatrick similarly testified that "[j]ust talking about a case outside of the office where we know we're not supposed to be talking about cases that are confidential, you don't do that." R. 340. See also *id.* at 335 (Kirkpatrick dep.) (stating that if Ms. Dixon received an inquiry about an investigation she should refer the questioner to her as Executive Director); *id.* at 342 (stating that the board had a policy applicable to Ms. Dixon's position "not to speak about investigations outside the office" even if there had already been reports in the media); *id.* at 380 (testimony of another board member that it is "prudent" for employees to refrain from discussing "vet board matters" even if they are not "confidential," but that this is not a "requirement").

In February 2003, OBVME began an investigation into an illegal dogfighting ring. Ms. Dixon objected to the use of OBVME funds on the investigation because it was not, she believed, OBVME's mission "to be out there

-4-

busting John Doe for fighting dogs or selling dope or anything else." Ms. Dixon had expressed to her supervisor, Cathy Kirkpatrick, that OBVME was getting "involved in things that were not a part of what the veterinary board was designed to do." She also had complained to the investigator who was working on the case, Dale Fullerton.

In May 2004, the dogfighting investigation ended in a bust. The bust was reported in a prominent local newspaper over two days. One story stated that during the investigation the "Board of Veterinary Medical Examiners was brought in" to assist the Oklahoma Bureau of Narcotics. "Eventually," the story said, "two undercover state narcotics agents and one from the veterinary board infiltrated" the dogfighting "underworld." David Zizzo, *Dogfighters Work Hard to Maintain Secret Community*, The Oklahoman, May 24, 2007, at 1A. *See also* Tony Thornton, *Raids Net Packs of Fighting Dogs*, The Oklahoman, May 26, 2004, at 1A ("Investigating agencies included the Oklahoma State Board of Veterinary Medicine and the Oklahoma and Hughes County Sheriff's Departments."). Ms. Kirkpatrick was quoted in the newspaper accounts. The stories did not mention the involvement of any veterinarian in the investigation or the bust. There was a second bust, later, in July, which was part of the same investigation.

In late May, shortly after the second article appeared in the newspaper, Ms. Dixon took her pets to her personal veterinarian, Dr. James Stock, to be

vaccinated. Dr. Stock was a member of the "legislative committee" of the Oklahoma Veterinary Medical Association, a private trade organization for veterinarians. According to Dr. Stock's account of the visit, he "quizzed" Ms. Dixon about the dogfighting investigation, in particular why OBVME was involved in it if no veterinarians were implicated in the dogfighting ring. R. 271, 272 (Stock dep.). Ms. Dixon answered: "Well that's kind of what I'd like to know, too." *Id.* at 272. She added that there were "a lot of things" she wanted to discuss with Dr. Stock. Dr. Stock suggested that they could meet some other time. *Id.* Dr. Stock stated that Ms. Dixon had "led [him] to believe" that no veterinarian was involved in the investigation. *Id.* at 273, 275. Ms. Dixon denies that she said anything misleading, and that, to the contrary, she "made it clear that while there was a veterinarian against whom a complaint had been made, the investigator had not confined his investigation to the veterinarian or to my knowledge, investigated the veterinarian at all." R. 269 (Dixon aff.).

Dr. Stock said later that he asked Ms. Dixon about the investigation because he felt that as a member of the legislative committee he could take action if the "vet board was doing something that [he] felt was contrary to [his] profession." *Id.* at 276. According to his understanding of the OBVME, "they regulate veterinarians, good or bad, and if no veterinarians are involved, then no matter what's going on, they really shouldn't necessarily be involved" in an investigation of dogfighting. *Id.* at 273. There was "no problem whatsoever"

with such an investigation if a veterinarian was involved, even if ultimately no veterinarian were found to be guilty. *Id.*

Ms. Dixon and Dr. Stock met again in June, this time at Ms. Dixon's instigation. She told Dr. Stock that she believed that the dogfighting investigation was "outside the scope of the Veterinary Practice Act and Mission Statement," and that funds were being wasted on the investigation. Dr. Stock testified that in this conversation, as in the first, Ms. Dixon led him to believe that there was no veterinarian involved in the dogfighting scheme. *Id.* at 201. Ms. Dixon also made numerous complaints about the investigator, Mr. Fullerton, including that he exceeded the speed limit in state-owned vehicles, carried a sidearm when he went in to talk to veterinarians, and that he had made racist and sexist remarks. She described Mr. Fullerton as "like a little Rambo," and said that he "needed to stick to the business of the veterinary board and not [be] out there trying to be the great cop of Oklahoma and [a]ffect all things." *Id.* at 350. She also complained about the way Ms. Kirkpatrick was administering the office.[2] *Id.* at 201. At this time, Ms. Dixon apparently believed that the dogfighting investigation was over, but in fact the investigation led to a second bust the following month. R. 354 (Dixon dep.).

---

[2] At one meeting with Dr. Stock, Ms. Dixon apparently showed him documents about a pending investigation against an entity called "ProCon," a drug pharmaceutical distributor. R. 273–74.

-7-

Ms. Dixon later said that she told these things to Dr. Stock because she "hoped that he would go to the legislative committee and explain to them that the investigator was out of control." Id. at 359 (Dixon dep.). She believed that problems of the sort she had discussed would continue as long as the investigator continued to have police powers. *Id.* at 203-04.

Dr. Stock did get the attention of the Board, or at least of Ms. Kirkpatrick. Ms. Kirkpatrick attended a meeting of the legislative committee of the Oklahoma Veterinary Medical Association. Dr. Stock asked her: "Can you tell me why the Veterinary Board is involved in the dog fighting investigation?" *Id.* at 293, 163. (Kirkpatrick dep.). (According to Dr. Stock, his question was "Are there any – any vets?" *Id*. at 204 (Stock dep.)). Ms. Kirkpatrick described his question as "pointed." *Id*. at 163, 293 (Kirkpatrick dep.). Ms. Kirkpatrick answered that "there was a veterinarian and there's others — other veterinarians implicated." *Id.* at 163. Dr. Stock appeared satisfied with her answer.

Dr. Stock's question gave Ms. Kirkpatrick the "big suspicion" that Ms. Dixon had "spoken to an individual outside of the office regarding investigations." R. 293, 163. Ms. Kirkpatrick asked Dr. Lee Denny, a veterinarian who is a member of the OBVME board, to contact Dr. Stock and ask about his conversations with Ms. Dixon. Dr. Stock confirmed that Ms. Dixon (whom Dr. Stock referred to as "our secretary at the board office") had discussed the investigation with him. *Id.* at 376 (Denny dep.). Dr. Denny relayed this

-8-

answer to Ms. Kirkpatrick. *Id.* at 335 (Kirkpatrick dep.). With her suspicions confirmed that Ms. Dixon was the source of Dr. Stock's misinformation about the investigation, and after giving Ms. Dixon time off to consider whether to reconsider her attitude toward her work, *id.* at 339, Ms. Kirkpatrick terminated Ms. Dixon on July 14.

Ms. Dixon's termination letter apparently did not contain a statement of reasons for her dismissal. In her appellate brief, Ms. Kirkpatrick says Ms. Dixon was fired "for a plethora of reasons related to her work performance and disruption to the office and its mission." Appellant's Br. 6. Ms. Kirkpatrick does not deny that one of those reasons was Ms. Dixon's conversations with Dr. Stock. In her deposition, Ms. Kirkpatrick affirmed that one reason Ms. Dixon was discharged was "her speaking to Dr. Stock about the dog-fighting investigation." R. 331. Later, in the context of opposing Ms. Dixon's claim for unemployment compensation, OBVME stated that the reasons for the discharge were "insubordination and divulging information about an investigation." *Id.* There is evidence that Ms. Kirkpatrick was not aware that Ms. Dixon had divulged any "specifics . . . regarding the dog-fighting investigation that wasn't already in the newspaper," though she suspected that Ms. Dixon had conveyed additional information about the conduct of the investigation that "undermin[ed] the investigator." R. 335-36, 340 (Kirkpatrick dep.) Indeed, because Ms. Kirkpatrick was apparently unaware of the details of Ms. Dixon's conversation with Dr. Stock

at the time of the termination, the termination decision could not have been based on the disclosure of specific confidential information.

Ms. Dixon filed suit in state court, alleging that she had been fired "in retaliation and in response to [her] speaking as a citizen on matters of public concern by reporting wrongdoing at OBVME." After extensive discovery, the state case was dismissed by stipulation of the parties, and Ms. Dixon refiled in federal district court. The parties stipulated that they would be bound by the discovery responses provided in the state court action. Ms. Kirkpatrick and OBVME moved for summary judgment, arguing that Ms. Dixon was not speaking on a matter of "public concern," but that if she was, OBVME was justified in regulating her speech. Ms. Kirkpatrick also contended that she was entitled to qualified immunity because the law was not clearly established at the time of Ms. Dixon's termination. The district court denied the motion for summary judgment on all three issues.

## II. STANDARD OF REVIEW OF INTERLOCUTORY APPEAL OF DENIAL OF SUMMARY JUDGMENT IN A QUALIFIED IMMUNITY CASE

"The denial of a summary judgment motion ordinarily is not an appealable final order." *Bass v. Richards*, 308 F.3d 1081, 1086 (10th Cir. 2002). When a party has been denied qualified immunity, that denial can be appealed prior to a final judgment *only* to the extent that the appeal is based on an issue of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see also Shrum v. City of Coweta*,

-10-

449 F.3d 1132, 1137 (10th Cir. 2006) (orders denying qualified immunity before trial are appealable only if they involve "abstract issues of law"). A district court's determination that the record raises a "genuine issue of material fact," precluding summary judgment in favor of the defendants, is not appealable even in a qualified immunity case. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Thus, in deciding these issues of law, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficient supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004). Unlike other appeals from summary judgment decisions (which are, perforce, appeals of grants rather than denials), the appellate court in an interlocutory appeal regarding qualified immunity "can simply take, as given, the facts that the district court assumed when it denied summary judgment for [a] (purely legal) reason." *Johnson*, 515 U.S. 319. It is not the job of the appellate court to determine whether the record supports the district court's factual assumptions. *Kinney*, 367 F.3d at 348.[3]

### III. APPLYING THE *GARCETTI/PICKERING* TEST

The test for determining whether Ms. Dixon was denied her constitutional rights by being terminated for speaking on matters of public concern is the *Pickering* test, now modified by the Supreme Court's decision in *Garcetti v.*

---

[3] The Appellant is therefore incorrect to state that we must "conduct a de novo review of the record" to determine whether there were disputed issues of material fact. Appellant's Reply Br. 2.

*Ceballos*, 547 U.S. 410 (2006). *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202 (10th Cir. 2007) (describing what we now call the "'*Garcetti/Pickering*' analysis"); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The test comprises five elements, called "prongs": (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Id.* at 1202–03. The first three "prongs" are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder. *Id.* at 1203.

## A. Undisputed Issues

The first, fourth, and fifth elements of the *Garcetti/Pickering* test are not challenged by the appellant. The OBVME and Ms. Kirkpatrick conceded below that "it was not a part of [Ms. Dixon's] duties to opine on the used [sic] of OBVME funds in investigations or discuss ongoing investigations." The first element of the test, which was added by *Garcetti*, is therefore deemed satisfied for purposes of this appeal.

Ms. Kirkpatrick devotes many pages of her appellate brief to summarizing facts in the record regarding Ms. Dixon's allegedly poor work performance. Appellant's Br. 4, 5–6, 19. According to the appellant, as a result of Ms. Dixon's belief that OBVME should not have become involved in the dogfighting investigation, Ms. Dixon intentionally performed lower quality work and became uncooperative and disruptive. These facts might well justify the plaintiff's termination under the fourth or fifth element in the test, but the defendants did not argue this either in support of their summary judgment motion in district court or in the legal argument section of their brief in this court. For purposes of this appeal, therefore, we will assume that Ms. Dixon was terminated because of her speech.

### B. Public Concern

There is some controversy about whether the "matter of public concern" element of the test was conceded below. In her Request for Admissions, the plaintiff asked the defendants to "Admit Plaintiff spoke to Cathy Kirkpatrick and James Stock, D.V.M., on matters of public concern." After objecting to the form of the request, the defendants responded: "it is admitted, upon information and belief, that Plaintiff did speak, on occasion, to those persons on matters of 'public concern.'" R. 209. In their motion for summary judgment, however, the defendants denied the admission, noting that they had also stated that the request for an admission on this point was "vague, ambiguous, susceptible to

interpretation and undefined in terms of scope, date or subject matter." They added: "To the extent it holds any significance, Defendant OBVME supplements the response to 'Denied.'"

Both Oklahoma and federal rules of civil procedure provide that "[a]ny matter admitted under this section is conclusively established unless the court on motion permits withdrawal or amendment of the admission." 12 Okla. Stat. § 3236(B). *Cf.* Fed. R. Civ. P. 36(b). There is no indication that OBVME or Ms. Dixon ever moved to withdraw or amend their original admission. Ms. Dixon contends that this precludes their challenge to the denial of summary judgment on this issue.

We agree that the defendants are bound by their admission, but regard the admission as limited in practical effect. Defendants admitted that Ms. Dixon spoke "on occasion" to Ms. Kirkpatrick and Dr. Stock on matters of public concern, but they were not asked and did not volunteer which statements those were. We do not regard the admission as conclusive with respect to each and every statement Ms. Dixon made to these two persons, but only to preclude the appellant from arguing that none of Ms. Dixon's speech fell into that constitutionally protected category.

The speech involved in this case may be divided into three categories: (1) Ms. Dixon's internal complaints to Ms. Kirkpatrick and others about the investigator's conduct and other matters, (2) her complaint to Dr. Stock that the

dogfighting investigation was unauthorized and improper, and (3) her complaints to Dr. Stock about the way Mr. Fullerton and Ms. Kirkpatrick carried out their responsibilities. In rejecting the defendants' motion for summary judgment on this issue, the district court did not distinguish among these various categories of speech. The court held that "improper expenditures of public funds, illegal behavior by OBVME employees including speeding in state-owned vehicles, and discriminatory practices" were matters of public concern. "Improper expenditures of public funds" is apparently a reference to Ms. Dixon's claim that the dogfighting investigation was beyond its authority. See Appellee's Br. 17.[4] We conclude that Ms. Dixon's conversations with Dr. Stock regarding the supposedly improper use of OBVME resources to investigate the dogfighting ring involved matters of public concern, but that none of the other subjects raised in her conversations were entitled to constitutional protection under the second prong of *Garcetti/Pickering*.

The appellant argues that Ms. Dixon's "disagree[ment] with the investigation" and "disclos[ure of] its existence to one veterinarian" outside of any public forum or "any forum which could effect change in government policy" amounted to nothing more than "the airing of a work related grievance." We find this argument unpersuasive. OBVME's involvement in the dogfighting

---

[4]It also may refer to an incident in which Ms. Kirkpatrick allegedly misidentified a $13 work-related expense on a reimbursement form.

investigation was the subject of extensive reporting in a major local daily newspaper. Dr. Stock, indeed, initiated his conversation with Ms. Dixon based on his reading of a story in the newspaper. Moreover, Dr. Stock was not just "one veterinarian"; he was a member of the legislative committee of the veterinary professional association, which engaged in public advocacy on the subject of veterinary regulation and was concerned about the investigation. Both Ms. Dixon and Dr. Stock testified that they engaged in the conversation with a view to his raising the issue with the authorities. Armed with the information he received from Ms. Dixon, Dr. Stock confronted the director of OBVME at a legislative committee meeting and demanded an explanation. That is sufficient to support the district court's legal conclusion that Ms. Dixon's speech on this subject was a matter of public concern.

No such argument can be made about Ms. Dixon's complaints about Mr. Fullerton's conduct and Ms. Kirkpatrick's management style. These were mostly trivial in nature. They included such things as manner of dress, use of tobacco, driving habits, temperament, a mislabeled $13 expense charge, and so forth. Serious complaints about discrimination can certainly be a matter of public concern, but the record reveals discussion of nothing more than a few stray comments. None of the issues other than the dogfighting investigation generated any press coverage, nor were they related to any legislative concerns. Dr. Stock repeatedly stated in his deposition that his only concern was whether OBVME

was conducting an investigation in the absence of any involvement by a veterinarian. When he learned, contrary to the impression he had received from Ms. Dixon, that veterinarians had in fact been involved in the dogfighting operation, Dr. Stock was satisfied and did not think there was any other problem with the investigation. When Ms. Dixon asked him whether he had brought up Mr. Fullerton and "how things are being run there," Dr. Stock told her, "I don't really care how that's being run. I didn't feel like that was any of my business to tell them how to run their business." R. 275-76 (Stock dep.).

Whether speech is a matter of public concern is a legal issue, to be determined by the district court as a matter of law and reviewed de novo by the court of appeals. We conclude that, other than the issue of the dogfighting investigation, Ms. Dixon's complaints about individual co-workers and personnel issues were internal matters not of public concern. *See, e.g.*, *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1212 (10th Cir. 1998).

## C. Disruption

The third prong of the *Garcetti*/*Pickering* test is the nub of this case. After determining that the employee's speech is protected (which we have just done), we go on—in step three—to decide "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Brammer-Hoelter*, 492 F.3d at 1203 (quoting *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007)). Although this element is framed as

-17-

a "balancing" test, this Court has held that First Amendment rights "are protected 'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996) (*quoting Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986), in turn *quoting Childers v. Ind. Sch. Dist. No. 1*, 676 F.2d 1338, 1341 (10th Cir. 1982)); *see Garcetti*, 547 US at 418 ("The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."); *Brammer-Hoelter*, 492 F.3d at 1207 ("the question is whether the employer 'has an efficiency interest which would justify it in restricting the particular speech at issue'", (*quoting Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (9th Cir. 1998))). In other words, unless the government employer can show that the termination was based on legitimate reasons grounded in the efficient conduct of public business, there is no need to proceed to balancing, and the First Amendment interest of the plaintiff prevails.

This Court has explained that in assessing this third prong, a court should generally consider "whether the [speech] impairs discipline . . ., has a detrimental impact on close working relationships . . ., or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Gardetto*, 100 F.3d at 815. We have cautioned that the employer "cannot rely on

purely speculative allegations that certain statements caused or will cause disruption." *Id*.

Citing *Gardetto*, but without further explanation, the district court denied summary judgment to the defendants on the ground that they "have failed to present sufficient evidence of actual disruption to outweigh Plaintiff's interest in her speech." Dist. Ct. Op. at 5. It is difficult to know, from this brief holding, to what evidence the district court is referring and therefore what "pure issue of law" we are asked to address in this interlocutory appeal. *See Johnson*, 515 U.S. at 319. The record in this case is lengthy. It contains a great deal of evidence, some of it conflicting, about the permissibility of a person in Ms. Dixon's position divulging information regarding current or ongoing investigations. Both parties pointed to record evidence relevant to these issues in their summary judgment briefs. We do not know whether to interpret the district court's cryptic ruling as a statement of the court's factual assumptions (i.e., that the defendants had not carried their burden to show undisputed evidence in support of their position) or as a statement of the court's legal conclusion (i.e., that given the facts established by the record, OBVME's reasons for discharging Ms. Dixon were illegitimate).

It would be helpful in *Garcetti/Pickering* cases, when the third prong is contested, for the district court to insist that the defendants identify precisely what interests in the efficiency of the public service they believe were served by

the termination, and for the district court to state in any order denying summary judgment on this ground whether its ruling is based on a factual insufficiency in the record or on a legal conclusion regarding the legitimacy of the asserted reasons for the termination. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.6 (1986). Lacking any such clarity in this case, we are forced to delve more deeply into the record than should be necessary in an interlocutory appeal of this sort.[5] *See Johnson*, 515 U.S. at 319 (where the district court does not state the facts upon which it based its decision, "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed").

The appellant argues primarily[6] that Ms. Dixon was discharged because, as an employee in an investigative office with access to confidential information, she should not have divulged information about an ongoing investigation to outside parties. Ms. Dixon's response rests primarily on the claim that although

---

[5] We have examined all portions of the record cited by the parties. We have not undertaken a *de novo* review of the entire record.

[6] The appellant also argues that "Plaintiff's conduct . . . was disruptive," referring to her refusal to work and disrespectful treatment of co-workers. Appellant's Br. 19. We agree with the appellee that this is essentially an argument under the fifth prong of *Garcetti/Pickering* that she would have been fired for her poor work performance even apart from her protected speech. The defendants did not present that argument to the district court and it is not before us on this appeal. *See Cragg*, 143 F.3d at 1347. Moreover, the appellee claims that the facts regarding her disruptive behavior are disputed. Appellee's Br. 25 n.11.

she discussed the investigation with an outside party, she did not divulge any information that was confidential and had not already been exposed in the press. The appellant notes that even if there is no evidence that Ms. Dixon revealed specific information that was confidential, she was apparently a source of "misinformation": she led Dr. Stock to believe, falsely, that no veterinarians were involved in the dogfighting investigation, thus creating the impression that the investigation was illegitimate. Ms. Kirkpatrick also argues that it was constitutionally permissible for the agency to fire an employee for discussing an ongoing investigation with an outside party even if there was no evidence of specific confidential disclosures.

We agree with the appellant on both points. If a government employer is entitled to dismiss an employee for divulging accurate confidential information not otherwise known to the public, the same must be true of false information. Certainly, the conveyance of false information would "interfere[] with the regular operation of the enterprise." *Gardetto*, 100 F.3d at 815. Ms. Dixon's indiscretion led an influential member of the professional association regulated by the OBVME to suspect agency wrongdoing, and to raise those suspicions at a meeting of his legislative committee. In this instance, the Executive Director was able to dispel his concerns at an early stage; but had the circumstances been different or Dr. Stock been less cautious, the damage to the investigation and to OBVME's reputation would have been more serious.

Citing to her own affidavit, the plaintiff responds that it is a disputed issue of fact whether Ms. Dixon actually told Dr. Stock that no veterinarians were involved in the dogfighting operation, or even implied it. She avers that she "made it clear" that a veterinarian was involved, R. 268–69 (Dixon affidavit), though she never explains what she said to Dr. Stock that effected this clarification. We do not regard this dispute as material. Whether or not Ms. Dixon imparted misinformation, it is undisputed that Dr. Stock interpreted her responses as confirming his suspicion that no veterinarians were involved in the dogfighting operation. Her own affidavit confirms that she discussed whether a veterinarian was involved. Whether the information she imparted to Dr. Stock was false or whether it was true, both participants confirm that their conversation touched on an important bit of information that was not reported in the press or known to the public: whether OBVME's investigation involved any veterinarians. Ms. Dixon does not dispute that she was not authorized to divulge nonpublic information to outside parties.

We also agree with the appellant, as a matter of law, that under these circumstances disclosure by a clerical employee of information about an ongoing investigation was a constitutionally sufficient basis for dismissal, even assuming the employer could not know whether she leaked specific information not known to the press and public. The reasons for forbidding such disclosures are manifold. Press reports are not always accurate; confirmation by agency insiders can supply

important information in the form of corroboration. (That is why the CIA regularly responds to inquiries by saying it can "neither confirm nor deny.") Questioners with special knowledge or background are often capable of eliciting new information even when their informant is unaware she is going beyond the public record. Sometimes one question leads to another, and a well-intentioned informant discovers she has unintentionally spilled the beans. And however circumspect the agency employee may be, her supervisors are not usually able to monitor all conversations; a blanket rule against discussing ongoing investigations is easier to enforce.

Even drawing all factual inferences in Ms. Dixon's favor, and assuming she did not "compromise" the investigation merely by speaking to Dr. Stock, the salient point, we believe, is that she was an employee who had *access* to confidential information, and was repeatedly discussing an ongoing investigation with an interested party outside her office. The (presumed) fact that she did not disclose any specific confidential information is less important than that she *could* and *might* have—perhaps even without being aware she was doing so. Ms. Kirkpatrick was the "point woman" to whom inquiries regarding OBVME investigations were to be addressed. Having unauthorized employees taking it upon themselves to open up alternative channels of inside information about the organization and its practices plausibly constitutes a "disruption" in the operation of the organization. *Garetto*, 100 F.3d at 815.

In response, the plaintiff argues first that there is no evidence in the record of a formal OBVME policy against disclosure of information about an ongoing investigation, other than specific confidential information not already known to the press and public. Appellee's Brief at 27. We do not entirely agree. Testimony by the chairman of the OBVME, by Ms. Kirkpatrick, and by the plaintiff herself indicates that such a policy existed, was "common knowledge" among employees, and was known to Ms. Dixon. *See supra* 3–4, above. One member of the board, however, described the prohibition as a matter of "prudent" judgment while saying that it was not a "requirement." R. 380. Drawing all factual inferences in favor of the plaintiff as the party opposing summary judgment, we assume that no such policy was formalized or officially made a "requirement" of the job. But we do not think the dispute is material. Nothing in the First Amendment jurisprudence of the Supreme Court or this Court (or, so far as we are aware, that of other Courts of Appeals) holds that public employees may not be terminated for speech that is disruptive to agency operations unless the agency had promulgated a formal policy on the issue in advance. Whether the employer's action was pursuant to a properly promulgated and announced official policy may be a question of contract law, employment law, or administrative law, but it is not a concern of the First Amendment. The question before us is whether the government employer's interest in restricting the employee's speech is sufficient to outweigh the employee's First Amendment interest. The existence of

a formal policy may well strengthen the employer's argument in cases where such a policy has been promulgated, but its absence does not render the employer helpless to discipline an employee whose speech has disrupted the work of the agency.

The plaintiff argues next that there could be no genuine policy against disclosing information about an ongoing investigation because the board itself, and Ms. Kirkpatrick, made public statements regarding the investigation. Appellee's Br. 27. *See* R. 301 (Kirkpatrick dep.) (explaining what information she would provide in response to public inquiries). This is a non sequitur. It was part of Ms. Kirkpatrick's job as Executive Director to address the media on OBVME's behalf. R. 343 (Kirkpatrick dep.). It does not follow from the fact that agencies or heads of agencies must sometimes provide information to the public about investigations that low-level employees who have access to confidential materials may take it upon themselves to reveal information about investigations. A district attorney will often speak to the press about an investigation; that does not mean that every employee in the homicide division is free to do the same.

The plaintiff argues next that a policy prohibiting Ms. Dixon from disclosing information about investigations "would have violated state law." Appellee's Br. 28, citing the Oklahoma Open Records Act and Oklahoma Statute Tit. 51, § 24A.1 *et seq.* This Act does not require or permit clerical employees or

investigative assistants to speak to outsiders about investigations. The obligations run to the agency, not to Ms. Dixon. Moreover, Ms. Dixon does not specify which "record" she was prevented from "disclosing" to the public. Her unofficial conversations with Dr. Stock in his veterinary office on her own time had nothing to do with providing public records to anyone "during regular business hours." Okla. Stat. Tit. 51, § 24A.5.

The plaintiff's final argument on this point is that such a policy would be a "prior restraint on speech," which would violate the First Amendment "on its face and as applied to Ms. Dixon." Appellee's Br. 28. This argument defies both law and common sense. Ms. Dixon was not restrained before the fact; she was terminated after the fact for speech believed to be disruptive of agency operations. "[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens." *Brammer-Holter*, 492 F.3d at 1209 (quoting *Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002)). Typically, a prior restraint is a requirement that a speaker obtain government approval for her message in advance of publishing it—or, in rare cases, a "gag order" targeted at particular speech. *Arndt*, 309 F.3d at 1251–52. There is nothing in this case to suggest that OBVME's response to Ms. Dixon's speech was anything other than an "adverse action" that was "taken in response to actual speech."

Having concluded that OBVME had a legitimate reason for terminating Ms. Dixon, rooted in the disruptive effect of disclosures by employees of information about ongoing investigations, we must turn to the balancing. Ms. Dixon's speech regarding the conduct of the dogfighting investigation arguably sought to expose what she perceived to be the misuse of public funds by Mr. Fullerton and, by extension, OBVME. Characterized as such, that speech was of public concern, and putting aside its allegedly misleading character as we must (even false speech deserves some First Amendment protection), even of some public importance. *See Conaway v. Smith*, 853 F.2d 789, 797 (10th Cir. 1988) ("Speech that seeks to expose improper operations of the government . . . clearly concerns vital public interests."). But we have to weigh Ms. Dixon's interest in making that speech, and the interest of her audience in hearing it, against the interests of her government employer. *Brammer-Hoelter*, 492 F.3d at 1207. While "there is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment," *Id.* (quoting *Casey,* 473 F.3d at 1333), the balance in this case clearly tips towards OBVME.

The Supreme Court has recognized the employer's significant interest in regulating speech that "interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) (citing employer's interest in "avoiding

-27-

direct disruption . . . of the public employer's internal operations and employment relationships."). Certainly having to worry about the possibility that Ms. Dixon would leak confidential information counts as disruptive of the everyday operations of OBVME. OBVME has every reason for a policy that discourages employees from speaking out on outgoing investigations, especially employees who have regular access to confidential and sensitive information.

*Pickering* also alludes to the interests of an employer in speaking in a single, consistent voice. *Pickering*, 391 U.S at 572-573. *See also* Cass R. Sunstein, *Government Control of Information*, 74 Cal. L. Rev. 889, 919 (1986) ("In its capacity as employer, the government has two interests that come up in many contexts: the desire to avoid disruption of working relationships and the need to set out a uniform official position."). By speaking out, unauthorized by her employer, Ms. Dixon not only risked compromising the dogfighting investigation (an investigation that was still going on) but also frustrated the ability of OBVME to control and fashion its own message. Both of these are important interests, and in this case we find that, when balanced against Ms. Dixon's speech rights, they should win out.

We need not, and could not, decide today the full range of circumstances in which a government employer is entitled to forbid discussion of agency operations with outside parties. We can address only the circumstances of this case. Among the circumstances that inform our decision are (1) that OBVME is

an investigative agency with legitimate concerns about confidentiality; (2) the breach of confidence involved an ongoing investigation; (3) the employee involved was in investigative assistant, with access to confidential information because of her typing and filing duties but no discretionary authority over the matters she discussed; (4) the employee was aware that the agency did not want its employees to discuss investigations with outside parties, but instead to refer inquiries about investigations to the executive director; (5) the disclosures did not involve criminal misconduct[7] or other serious wrongdoing, but at worst the employee's disagreement about the use of agency resources; and (6) the disclosures were made to an interested outside party and not to a public body with authority to investigate or redress her employers' wrongdoing if there were any. We offer no opinion regarding other potential cases.

We therefore hold that, on *de novo* review of this issue of law, the defendants' termination of an employee for unauthorized disclosure of information about an ongoing investigation, under the circumstances of this case, was "necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Gardetto*, 100 F.3d at 815. The

---

[7] Some of Ms. Dixon's speech, apart from her speech about the dogfighting investigation, may have involved allegations of criminal misconduct such as speeding or mislabeling expense reports. We confine our attention here to aspects of Ms. Dixon's speech that we have concluded addressed matters of public concern.

appellant is entitled to qualified immunity on the ground that the defendants'

actions did not violate the plaintiff's First Amendment rights.

## IV. CONCLUSION

The judgment of the United States District Court for the Western District of

Oklahoma is REVERSED, and the case remanded for entry of an order granting

summary judgment in favor of the appellant.