FILED
United States Court of Appeals
Tenth Circuit

January 8, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ROSEMARY DRISCOLL,

      Plaintiff-Appellant,

v.

ERIC A.M. DENNIS; CLARK C.
GRIFFITH; LAW OFFICE OF CLARK
C. GRIFFITH, a Minnesota Professional
Association,

      Defendants-Appellees.

No. 11-1442
(D.C. No. 1:07-CV-00608-RPM-MJW)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

Rosemary Driscoll appeals from the district court's determination that she

failed to show that she owned the 250,000 shares of stock that she accused

defendants of converting.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## *Background*

Mrs. Driscoll's late husband, William Driscoll, was the CEO and president of Lifeline Therapeutics, Inc., a Colorado corporation. Mr. Driscoll held millions of shares of unregistered common stock in Lifeline, one million of which he gave to Mrs. Driscoll. Mr. Driscoll managed the family's shares, including Mrs. Driscoll's.

In the summer of 2005, Mr. Driscoll decided to sell some Lifeline shares. Since he qualified as an affiliate of the company, his shares were restricted. He learned that Eric A.M. Dennis bought restricted stock at a discount from the public market price. Mr. Driscoll and Mr. Dennis arranged a sale of 40,000 shares to a family trust established by Mr. Dennis's lawyer, Clark C. Griffith, for Mr. Griffith's grandchildren. The sale resulted in a loss because the stock value declined rapidly during the required holding period after the sale.

Negotiations began for Mr. Driscoll to sell Mr. Dennis even more shares. At the same time, Mr. Dennis was negotiating a sale with Christopher Micklatcher, a former director and treasurer of Lifeline. Mr. Micklatcher was no longer an affiliate of Lifeline, and the restrictions on his stock were expected to expire in October 2005. As the district court stated, "Mr. Micklatcher testified that Mr. Dennis devised a plan to have Mr. Micklatcher borrow 250,000 shares of Driscoll stock to sell them with 100,000 shares of Micklatcher stock to Eric Dennis who could tack on Micklatcher's holding period expiring in October, 2005." App. Vol. 1 at 49.

In a memorandum to Lifeline's stock transfer agent dated August 2, 2005, Mr. Micklatcher stated that he was transferring to Mr. Dennis 100,000 shares held in his name and 250,000 shares held jointly in his and his wife's name. He further stated that he and his wife would be receiving 300,000 shares from Mr. Driscoll. On August 16, 2005, the transfer agent recorded the receipt and issuance of several stock certificates related to these transactions. With regard to the 40,000-share sale, the transfer agent received certificate no. 1125 for 100,000 shares in Mr. Driscoll's name and issued certificate no. 1133 for 40,000 shares to Bank of America and Clark C. Griffith and no. 1134 for 60,000 shares to Mr. Driscoll. With regard to the 350,000-share sale, the transfer agent received certificate nos. 890 and 891, each for 50,000 shares in Mr. Micklatcher's name, and no. 892 for 406,142 shares in the names of Mr. and Mrs. Micklatcher. It issued certificate no. 1135 for 350,000 shares to Mr. Dennis and no. 1136 for 156,142 shares to Mr. and Mrs. Micklatcher.

Mr. Griffith acknowledged receiving certificate no. 1135 and committed to holding it in safekeeping pending further instructions. Before the shares were paid for, however, the transfer agent recorded receiving certificate no. 1135 and issued new certificates to Mr. Dennis and Mr. Griffith in various amounts totaling 350,000 shares. Ultimately, Mr. Micklatcher received $50,000 for the sale of 20,000 shares and was returned 77,500 shares, with the balance retained by Mr. Dennis and Mr. Griffith to cover expenses. Neither the Driscolls nor Mr. Micklatcher were ever paid for the other 250,000 shares represented by certificate no. 1135; the district

court found that the shares were sold and "Mr. Dennis and Mr. Griffith took the proceeds for their own uses." *Id.* at 52.

Mrs. Driscoll brought claims against Mr. Dennis for breach of contract and unjust enrichment, against Mr. Griffith and his law office for negligence and breach of fiduciary duty for releasing certificate no. 1135 without proper instructions, and against all the defendants for converting the 250,000 shares. The matter came before the court for a bench trial.

Mr. Driscoll (in a preservation deposition) testified that he had transferred 300,000 of Mrs. Driscoll's shares to Mr. Micklatcher, who was to forward 250,000 of those shares to Mr. Dennis. Mr. Micklatcher repeatedly testified that the deal involved 100,000 of his shares and 250,000 shares belonging to Mr. or Mrs. Driscoll. He also acknowledged receiving 300,000 shares from Mr. Driscoll. Both Mr. Driscoll and Mr. Micklatcher admitted that on its face certificate no. 1135 represented only Micklatcher shares, but reiterated that all the parties knew that 250,000 of them were Driscoll shares. As Mr. Driscoll stated, "It was his certificate, but they were basically kind of representing 250,000 shares of Rosemary's." *Id.* at 145-46. Mr. Dennis, however, testified that he was not interested in purchasing restricted shares after the trust deal, and so he purchased only Micklatcher shares, which were coming off restriction soon. Mr. Griffith testified that he had relied on Mr. Micklatcher's written representations that he was selling only his own and his wife's shares.

Although the district court recognized that Mr. Dennis and Mr. Griffith acquired 250,000 shares without paying for them, it ruled in their favor because it was not convinced that Mrs. Driscoll had shown that she owned the shares at issue:

> It is clear that the defendants obtained the proceeds from 250,000 shares of Lifeline stock without payment to anyone.  It is not clear to whom payment was due.  On the face of the transactions, those shares were owned by Christopher and Nancy Micklatcher[.] There are references to "Bill Driscoll's" stock in the negotiations and it is apparent that animosity developed between him and the defendants which may have been the result of a loss on the 40,000 shares purchased by the Griffith Trust.

> For Rosemary Driscoll to recover for the value of the 250,000 shares in Certificate No. 1135, there must be evidence of her ownership and there is none that is sufficient.  There is no record of any stock certificates in her name.  Mr. Micklatcher's reference to the expected transfer of 300,000 shares from William Driscoll in his letter to the transfer agent is prospective and there is no evidence that it occurred or any explanation as to the 50,000 share difference or why the shares were those of Rosemary.

> Because the plaintiff has failed to prove ownership of any of the stock in Certificate No. 1135, her claims are denied[.]

*Id.* at 52-53.  Mrs. Driscoll appeals.

### *Analysis*

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo."  *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001).

Mrs. Driscoll seeks de novo review, arguing that the district court legally erred in holding "that because the stock certificates did not bear Mrs. Driscoll's name, none of the other evidence of her ownership could sustain her claims against Griffith

- 5 -

and/or Dennis." Aplt. Br. at 24-25. We disagree with Mrs. Driscoll's reading of the order. The district court did not opine as a matter of law that a stock certificate was required. Instead, it made a factual finding and discussed some of the evidence that persuaded it to reach that finding.

Mrs. Driscoll further argues that the district court legally erred in failing to give conclusive effect to the defendants' untimely and evasive responses to her requests for admissions, in which, she states, "they effectively admitted that Mrs. Driscoll was the owner of the 250,000 shares of Lifeline stock at issue." *Id.* at 28. We recognize Mrs. Driscoll's points regarding the effect of untimely and evasive responses to requests for admission. *See* Fed. R. Civ. P. 36. But because these requests for admissions were compound and ambiguous, we "regard the admission as limited in practical effect." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1303 (10th Cir. 2009); *see also Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 64 F.3d 1202, 1210 (8th Cir. 1995) ("The district court was in the best position to assess the significance of these responses . . . . The conclusive effect envisioned by the rule may not be appropriate where requests for admissions or the responses to them are subject to more than one interpretation."). Under these circumstances, we cannot conclude that the district court was required to treat the admissions as conclusively establishing Mrs. Driscoll's ownership.

Finally, Mrs. Driscoll argues that the district court clearly erred in finding that she failed to show that she owned the shares because everyone who could have

owned the stock (Mr. Driscoll, Mrs. Driscoll, and Mr. Micklatcher) all agreed that Mrs. Driscoll was the owner. She also points to e-mail messages among the parties that corroborate her position. The problem for Mrs. Driscoll, however, is that there also was evidence contradicting her position, including documents supporting the conclusion that certificate no. 1135 represented Micklatcher shares.

In reviewing for clear error, "[w]e view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence." *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1262 (10th Cir. 2007). It is well-settled that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," even if the "district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574.

Here the parties told different stories, with both sides presenting evidence in support. The factfinder chose not to accept Mrs. Driscoll's position. Because that finding rested on a permissible view of the evidence, we must accept it. "That the record supports a view of the evidence that is permissible but contrary to the trial

court's findings is not sufficient to warrant upsetting the lower court's findings."

*Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009).

The judgment of the district court is AFFIRMED.

Entered for the Court

Per Curiam