FILED
United States Court of Appeals
Tenth Circuit

January 18, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENK CIRCUIT

---

SONJA MORRIS,

       Plaintiff-Appellant,

v.

CITY OF COLORADO SPRINGS,
d/b/a Memorial Health System,

       Defendant-Appellee.

No. 10-1572

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:09-CV-01506-PAB-MEH)**

---

Ian D. Kalmanowitz, of Cornish & Dell'Olio, Colorado Springs, Colorado, for
Plaintiff-Appellant.

Edward J. Butler (Raymond M. Deeny with him on the brief), of Sherman &
Howard, L.L.C., Colorado Springs, Colorado, for Defendant-Appellee.

---

Before **O'BRIEN**, **GILMAN**[*], and **HOLMES**, Circuit Judges

---

**HOLMES**, Circuit Judge.

---

[*]      The Honorable Ronald L. Gilman of the United States Court of
Appeals for the Sixth Circuit, sitting by designation.

Plaintiff-Appellant Sonja Morris appeals from the district court's orders granting judgment on the pleadings on her First Amendment retaliation claim brought under 42 U.S.C. § 1983, and summary judgment on her claim for sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, in favor of Defendant-Appellee City of Colorado Springs. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are largely undisputed.[1] Sonja Morris is a registered nurse who works for the Memorial Health System ("Memorial"), an enterprise maintained by the City of Colorado Springs. She has been employed with Memorial continuously since January 2000. In November 2006, Ms. Morris joined Memorial's perioperative program, where she assisted with all types of surgeries except those involving the heart. Subsequently, in 2007, she joined the "Heart Team," which is a group of Memorial employees assigned to perform all heart surgeries done at the hospital.

Dr. Bryan Mahan is a surgeon on Memorial's Heart Team. During the time Ms. Morris was on the Heart Team with Dr. Mahan, she contends that he harassed her on multiple occasions. Specifically, she alleges that he made a number of

---

[1] There are disputes as to some of the underlying facts. Where relevant, those disputes are identified in this opinion. However, we are guided by the operative standards of review that are set forth *infra* in assessing the legal significance of those disputes and in interpreting the facts in the proper light.

demeaning comments to her. More generally, she claims that Dr. Mahan would treat female employees differently than male employees.

In June 2008, Dr. Mahan hit Ms. Morris on the head by "flicking her with his finger without her permission." Aplt. App. at 305 (Dist. Ct. Order, filed Nov. 19, 2010). Ms. Morris claims that he also hit her on the head in a similar fashion without permission a couple of weeks later.

Another incident occurred in August 2008—on the Friday before Labor Day weekend—when Ms. Morris was assisting Dr. Mahan with a pericardiectomy.[2] After Dr. Mahan surgically removed pericardium tissue from the patient on the operating table, he threw it in Ms. Morris's direction. Dr. Mahan claims that he intended only to throw the tissue on the floor behind him. Nonetheless, the tissue hit Ms. Morris's leg, prompting Dr. Mahan to say, "Oh shit, I hit her." Aplee. Br. at 6. He then joked about completing "cultures" on the tissue. When the incident occurred, Ms. Morris was wearing only scrubs—i.e., "the basic blue nursing uniform that is worn throughout the hospital by nurses." Aplt. App. at 216 (Tr. of Dep. of Sonja Morris, taken Jan. 8, 2010). She was not wearing "reinforced" protective gear such that "if it is soiled with body fluids," there would be "less risk of soaking through" the clothing. Id. Although Ms. Morris did not deny having blood on her scrubs before, id. at 133, she noted that it was "not a

---

[2] A "pericardiectomy" is the surgical removal of all or only a portion of the patient's pericardium, the protective tissue around the heart.

common occurrence" for her to have "blood or other bodily fluids come into contact with [her] clothing" when she was not wearing protective gear, *id.* at 216. However, Ms. Morris remained in the surgical suite until the procedure was finished without changing clothes.

A few days later, Ms. Morris reported the pericardium incident to Maria Pluemer, the director of surgery and Ms. Morris's supervisor during her tenure on the Heart Team. Ms. Pluemer then reported the incident to Memorial's head of human resources, Carlene Crall, who spoke with Ms. Morris about this incident and her other allegations of harassment. Ms. Crall investigated Ms. Morris's allegations by interviewing Dr. Mahan and other employees who were present in the operating room during the pericardium incident.

Ms. Crall also reported Ms. Morris's allegations to Dr. Lawrence McEvoy, Memorial's Chief Executive Officer, and Dr. Daniel Balch, Memorial's Chief of Staff. In response, on September 11, 2008, Doctors Balch and McEvoy transmitted a confidential memorandum to all members of the Heart Team, alerting them first that Dr. Mahan would not be in the operating room until further notice, and also that all members of the Heart Team would participate in a "team building program led by an outside professional." *Id.* at 306. Both Dr. Mahan and Ms. Morris participated in the training and worked together for roughly three months thereafter.

Then, on December 10, 2008, Ms. Morris submitted a Notice of Claim on Memorial. The notice stated that she had suffered damages as a result of the pericardium incident, and would pursue claims against the City of Colorado Springs and Dr. Mahan for "various torts, including . . . outrageous conduct and battery." *Id.* at 40 (Notice of Claim, dated Dec. 10, 2008). A week later, Ms. Crall sent Ms. Morris a letter recognizing the filing of the notice, and stating that Ms. Morris would be removed from the Heart Team and assigned to the main operating room because of Memorial's "obligation to place [her] in a work environment that is comfortable." *Id.* at 168 (Ltr. from Carlene B. Crall to Sonja Morris, dated Dec. 17, 2008).

On June 26, 2009, Ms. Morris filed suit against Memorial in federal district court, advancing a claim that her First Amendment right to petition was violated when she was removed from the Heart Team for submitting the Notice of Claim on Memorial and Dr. Mahan. She also asserted a claim under Title VII alleging that Dr. Mahan engaged in unlawful gender-based harassment and created an abusive and hostile working environment.

The district court granted Memorial's motion for judgment on the pleadings as to Ms. Morris's First Amendment claim, on the ground that the notice did not contain speech on a matter of public concern as determined under the balancing approach derived from *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Board of Education*, 391 U.S. 563 (1968). Subsequently, after permitting time

for discovery, the district court granted Memorial's motion for summary judgment on Ms. Morris's Title VII claim, on the ground that she could not establish that the alleged harassment was based on her gender or that it was sufficiently "severe" or "pervasive" to affect her working environment. Ms. Morris now appeals the district court's dismissal of both of her claims.

## II. STANDARD OF REVIEW

Ms. Morris's first claim was dismissed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and her second was dismissed on summary judgment. "We review a dismissal granted under Rule 12(c) 'under the standard of review applicable to a Rule 12(b)(6) motion to dismiss,'" *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005) (quoting *McHenry v. Utah Valley Hosp.*, 927 F.2d 1125, 1126 (10th Cir. 1991)), and "[u]nder that standard, we review the motion de novo, accepting factual allegations as true and considering them in the light most favorable to the plaintiff," *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1285–86 (10th Cir. 2011).

In addition, "[w]e review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). Namely, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In conducting the analysis, we "view[] all facts [and evidence] in the light most

favorable to the party opposing summary judgment." *Grynberg v. Total, S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

## III.  DISCUSSION

The district court dismissed both of Ms. Morris's claims.  On appeal, she contends that she properly stated a claim under 42 U.S.C. § 1983 in that the substance of her notice was protected by the First Amendment.  She also contends that genuine disputes of material fact precluded summary judgment on her Title VII hostile work environment claim.  We address both issues in turn.

## A.    **First Amendment Retaliation Claim**

Ms. Morris first argues that her First Amendment rights were violated when she was removed from the Heart Team shortly after filing her Notice of Claim on Memorial.  As the precedent of the Supreme Court and our court makes clear, "[a] government employer 'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression [under the First Amendment].'"  *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1285 (10th Cir. 2003) (quoting *Lytle v. City of Haysville*, 138 F.3d 857, 863 (10th Cir. 1998)); *see Connick v. Myers*, 461 U.S. 138, 142 (1983) ("[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *Martin v. City of Del City*, 179 F.3d 882, 886 (10th Cir. 1999) ("Public employees do not surrender their First Amendment rights by virtue of

- 7 -

their employment with the government."). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. This protection extends to the right "to petition the Government for a redress of grievances." U.S. Const. amend. I; *see Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495 (2011) ("The considerations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause."); *see also Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe,* 654 F.3d 1073, 1080 (10th Cir. 2011) (discussing *Guarnieri* and noting that "[v]ery recently the Supreme Court decided that the public-concern requirement should likewise apply when a government employee complains of retaliation based on his exercise of the First Amendment right to petition the government for redress of grievances").

"However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests 'in promoting the efficiency of the public services it performs through its employees.'" *Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Pickering*, 391 U.S. at 568). To "achieve this balance" in analyzing public-employee free speech claims, we have employed the five-part inquiry derived from the Supreme Court's decisions in *Garcetti* and *Pickering*, which we refer to here as the

"*Garcetti/Pickering*" test. *See id.* at 723–24. The *Garcetti/Pickering* test inquires into the following:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). "The first three prongs are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder." *Id.* (internal quotation marks omitted). The district court resolved Ms. Morris's retaliation claim on the second prong, holding that Ms. Morris could not show that her notice contained speech on a matter of public concern. We agree.

"Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Leverington*, 643 F.3d at 727 (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007)) (internal quotation marks omitted). The inquiry on whether speech pertains to a matter of public concern must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. In all cases, however, to arrive at the "crux of the public concern content inquiry," we must focus on "what is actually said on the topic." *Wren v.*

*Spurlock*, 798 F.2d 1313, 1317 n.1 (10th Cir. 1986) (emphasis omitted).

"[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

In this case, Ms. Morris's notice set forth a long description of the pericardium incident, and gave notice to the City of Colorado Springs and Dr. Mahan that she would be seeking recovery for "economic loss, humiliation and emotional distress" as a result of Dr. Mahan's commission of "various torts, including . . . outrageous conduct and battery."[3] Aplt. App. at 40. This document is clearly framed to provide notice of potential claims she would bring against the

---

[3] Ms. Morris claims that she has since made clear—in filing a supplemental affidavit in response to Memorial's motion for judgment on the pleadings—that her motive in serving the Notice of Claim was "to disclose conduct of Dr. Mahan which placed patients, employees, and Memorial Health System as a whole at risk of injury and liability." Aplt. App. at 59 (Aff. of Sonja Morris, filed Aug. 28, 2009). But this affidavit was neither attached to the complaint, nor referenced in it. *Cf. Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (noting that, "[i]n evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits . . . and documents incorporated into the complaint by reference" (citation omitted)). Moreover, the district court did not rely on the affidavit—or other external materials—in ruling on Memorial's motion. Thus, we do not consider it in addressing her arguments on appeal. *Cf. SEC v. Wolfson*, 539 F.3d 1249, 1264 (10th Cir. 2008) (stating that "when a motion for judgment on the pleadings is filed and 'matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment and disposed of as provided in Rule 56'" (emphasis omitted) (quoting Fed. R. Civ. P. 12(d)); *Alexander v. Oklahoma*, 382 F.3d 1206, 1214 (10th Cir. 2004) (suggesting that "to convert the District Court's Rule 12(b)(6) order to one for summary judgment, we must find that the District Court *relied* on [external] material in rendering its decision" (emphasis added)).

hospital and Dr. Mahan arising out of *her own* working conditions. That is, "what [was] actually said" in her allegations concerned essentially a "personal dispute or grievance." *Leverington*, 643 F.3d at 727. The content of the notice does not pertain to a matter of public concern on its face.

Ms. Morris maintains, however, that her efforts brought to light important issues "of interest to the community," *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000) (quoting *Lytle*, 138 F.3d at 863) (internal quotation marks omitted), because they illuminated "significant issues related to improper operation of a public hospital and the malfeasance, and potentially illegal conduct of a surgeon," Aplt. Opening Br. at 22.[4] Indeed, as she points out, the

_____

[4] Ms. Morris argues that the district court's failure to sufficiently analyze the particular context of her claim resulted in a "bright line" separating certain protected speech from speech about personal grievances which may also involve matters of public interest—such as the illumination of a State entity's illegal conduct. We have stated that "even speech that focuses on internal employment conditions and is made in the context of a personal dispute may be regarded as pertaining to a matter of public concern" in some instances. *David*, 101 F.3d at 1356 (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1404 (10th Cir. 1992)) (internal quotation marks omitted). However, we have contemplated that only a narrow range of speech would satisfy these conditions, specifically where the "subject matter is so imbued with the public interest that speech regarding it will almost always be a matter of public concern." *Deutsch v. Jordan*, 618 F.3d 1093, 1100 (10th Cir. 2010); *see, e.g.*, *id.* (noting that speech disclosing evidence of "'corruption, impropriety, or other malfeasance on the part of city officials clearly concerns matters of public import'"; thus, for instance, "not only is speech alleging that the police chief misused city funds ordinarily speech on a matter of public concern, but so, too, is speech defending against such allegations" (quoting *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998))); *David*, 101 F.3d at 1356 ("'[E]ven speech that focuses on internal employment conditions and is made in the context of a personal dispute may be

(continued...)

- 11 -

pericardium incident was the subject of a great deal of media coverage.  However, "[a] statement 'does not attain the status of public concern simply because its *subject matter* could, in different circumstances, have been the topic of a communication to the public that might be of general interest.'"  *Leverington*, 643 F.3d at 727 (emphasis added) (quoting *Salehpoor v. Shahinpoor*, 358 F.3d 782, 788 (10th Cir. 2004)).  Thus, the fact that the incident mentioned in her petition gained public interest does not mean that the petition itself was framed in a manner calculated to ignite that public interest.  "The right of a public employee [to petition] . . . is not a right to transform everyday employment disputes into matters for constitutional litigation."  *Guarnieri*, 131 S. Ct. at 2501.  Ms. Morris's notice is framed as lodging a complaint regarding an employment dispute, and seeking damages for it.  It does nothing more.  Because the notice "as alleged" was not on a matter of public concern, *Leverington*, 643 F.3d at 728, the district court properly dismissed Ms. Morris's first claim.[5]

---

[4](...continued)
regarded as pertaining to a matter of public concern if it addresses important constitutional rights which society at large has an interest in protecting.'" (quoting *Woodward*, 977 F.2d at 1404)).  As will be evident from our discussion *infra*, however, Ms. Morris's speech does not fall within this narrow range.

[5]     Because the district court properly dismissed Ms. Morris's claim on the "public concern" prong of the *Garcetti/Pickering* test, we need not address any other prong.  However, we note in passing that Ms. Morris argues that the district court erred in dismissing her claim alternatively on the first prong—*viz.*, "whether the speech was made pursuant to an employee's official duties."  *Dixon*, 553 F.3d at 1302.  This argument reflects a misreading of the district court's

(continued...)

## B.    Hostile Work Environment Claim

Ms. Morris also argues that the district court erred in dismissing her discrimination claim brought under Title VII.  Under Title VII, "it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'"  *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Ms. Morris may make out "a claim of sex discrimination based on a hostile work environment" if she can "show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment."  *Id.* (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)) (internal quotation marks omitted).  The district court determined that Ms. Morris failed to show both

---

[5](...continued)
order.  It was not focused on the first prong of *Garcetti/Pickering*; it just made reference to case law discussing whether an employee is "speaking as a citizen" in assessing whether any speech at issue is on a matter of public concern.  *See* Aplt. App. at 100 (Dist. Ct. Order, filed Feb. 25, 2010) (citing *Garcetti*, 547 U.S. at 419; *David*, 101 F.3d at 1355); *see also Merrifield*, 654 F.3d at 1080 ("The public-concern requirement serves to limit the protection of speech by an employee to speech that the employee makes in his capacity as a citizen, rather than simply as an employee.").  In other words, these cases—in the context in which the district court cited them—were not addressing "whether the speech was made pursuant to an employee's official duties," *Dixon*, 553 F.3d at 1302, under the first prong of *Garcetti/Pickering*.

that the alleged discrimination was gender related and that it was sufficiently severe or pervasive. We agree with the district court that Ms. Morris has failed to create a genuine dispute of material fact that any alleged "discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Id.* Consequently, we need not address whether she could make a showing that the alleged discrimination was based on her sex.

Title VII does not establish "a general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), for the workplace, *accord Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005); *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing the Supreme Court's hostile work environment decisions, and stating that "[a] recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (citation omitted) (quoting *Oncale*, 523 U.S. at 82) (internal quotation marks omitted)); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not

on that account satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life."); *DeNovellis v. Shalala*, 124 F.3d 298, 310 (1st Cir. 1997) ("Not all offensive conduct is actionable as harassment; trivial offenses do not suffice.").  "An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)) (internal quotation marks omitted).

"[A] plaintiff must show that the environment was both objectively and subjectively hostile or abusive."  *Davis*, 142 F.3d at 1341; *accord Russell v. Univ. of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008) ("The applicable 'test for a hostile work environment has both objective and subjective components.'" (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999))); *see also* 3 Lex K. Larson, *Employment Discrimination* § 46.05[3][e], at 46-93 (2d ed. 2011) (noting that "a dual standard . . . asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended" and opining that "[a] failure to prove either aspect is fatal to the Title VII claim").  Thus, we must assess "the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, *considering all the circumstances*."  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir.

2007) (emphasis added). In other words, we must look to a "totality of the circumstances," and "consider[] such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir. 2005) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)); *accord Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008). "[T]hat [objective] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. "Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another." *EEOC v. Fairbrook Med. Clinic, PA*, 609 F.3d 320, 328 (4th Cir. 2010).

Furthermore, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). However, "[i]n order to prevail on the subjective component of this test, the law does not require a plaintiff to show that the discriminatorily abusive work environment seriously affected her psychological well-being or that it tangibly impaired her work performance." *Davis*, 142 F.3d at 1341 (citation omitted).

Ms. Morris identifies various incidents that she submits altered the status of her working environment. "[T]he Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based on the infliction of a hostile working environment exists if the conduct is 'severe or pervasive.'" *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999); *see* 3 Larson, *supra*, § 46.05[3][b], at 46-82 ("Abusive conduct that is either severe *or* pervasive is actionable; it does not have to be both."). Addressing each allegation and considering them under a totality of the circumstances, first, we determine that the alleged incidents of harassment were not sufficiently "pervasive" to establish liability under Title VII. "[W]hether the complained of conduct is sufficiently pervasive as to create a hostile work environment must be determined from the totality of the circumstances since no single factor is required." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997).

Ms. Morris claims that Dr. Mahan hit her on the head twice within a two-week period.[6] However, these incidents are mere isolated ones, when viewed in the context of Ms. Morris's otherwise uneventful tenure on the Heart Team. She

---

[6] There appears to be some inconsistency in Ms. Morris's position concerning the magnitude of the offensive contact that occurred on these two occasions. Ms. Morris maintains in her brief that Dr. Mahan "hit" her "really hard." Aplt. Opening Br. at 6. However, her deposition indicates that the "hits" were really "flicks" with his finger to the back of her head. Aplt. App. at 131 (noting that "what the record should reflect is that the witness described that she used her thumb and middle finger and flicked the back of [a demonstrator's] head" to illustrate what had occurred).

did not complain about them for almost a year after they occurred and she does not contend that Dr. Mahan "hit" or "flicked" her on a regular basis—or otherwise physically threatened or abused her.

She also points to the pericardium incident. The parties dispute whether Dr. Mahan actually *intended* to throw the pericardium tissue at Ms. Morris in the operating room. It is undisputed, however, that he joked about the incident after it occurred. We will therefore view this evidence in the light most favorable to Ms. Morris, and assume that Dr. Mahan intended to throw the tissue at her. Even making this assumption, however, we cannot identify from the record any other remotely similar incidents affecting Ms. Morris that occurred during her employment. In addition, as the district court correctly notes, after she lodged a complaint about this incident, "[corrective] measures were taken that allowed her to work with Dr. Mahan *without* any difficulty." Aplt. App. at 312 (emphasis added).

Ms. Morris emphasizes that the latter incidents must also be considered in the context of her allegations that Dr. Mahan "would yell at her[ and] demean her work." Aplt. Opening Br. at 29. In that respect, she claims that "Dr. Mahan would . . . make comments to her such as 'get your ass in gear' or 'get someone in here who knows what they are doing.'" *Id.* at 6 (quoting Aplt. App. at 130). However, Ms. Morris does not elaborate on the circumstances surrounding the making of these comments. A plaintiff does not make a sufficient showing of a

- 18 -

pervasively hostile work environment "by demonstrating a few isolated incidents of . . . sporadic . . . slurs. . . . Instead, there must be a steady barrage of opprobrious . . . comments." *Chavez*, 397 F.3d at 832 (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)) (internal quotation marks omitted) (discussing a hostile work environment claim based on racial discrimination). Here, that is not the case.

On balance, there is simply insufficient evidence for a jury to find that the alleged harassment was pervasive. *See, e.g.*, *Vajdl v. Mesabi Acad. of Kidspeace, Inc.*, 484 F.3d 546, 551–52 (8th Cir. 2007) (concluding that isolated comments and touchings were not sufficiently pervasive); 3 Larson, *supra*, § 46.05[3][b], at 46-84 (collecting cases and noting that "a few isolated touchings, leers, or rude comments will generally not constitute actionable harassment"). Our case law stands in support of this conclusion. *See Sprague*, 129 F.3d at 1365–66 (concluding that "five separate incidents of allegedly sexually-oriented, offensive comments either directed to [the plaintiff] or made in her presence in a sixteen month period" were not sufficiently pervasive to support a hostile work environment claim); *cf. Chavez*, 397 F.3d at 833–36 (finding sufficient evidence of a hostile work environment based upon sexual discrimination where there was evidence that the plaintiffs had been subjected both to a "number of gender-based incidents" occurring over a long period of time, including sexual propositions, and "multiple incidents of hostile and physically threatening conduct"); *Harsco*

- 19 -

*Corp.*, 475 F.3d at 1184–85, 1188 (affirming district court's denial of the defendant's motion for judgment as a matter of law on a hostile work environment claim where the plaintiff presented substantial evidence of "an environment *polluted* with gender-specific comments and behavior that exceeded the mere flirtatiousness or baseness that has been found not to support a Title VII claim" (emphasis added)).

Alternatively, Ms. Morris argues that the harassment in her case was severe. She implies that even if there is insufficient evidence of pervasiveness, a claim may stand if the evidence shows that a few isolated incidents are in themselves "severe." In this respect, she emphasizes the pericardium and "hitting" incidents, and argues that, viewed in the context of her employment, they were sufficient to create a hostile and abusive working environment. In support, she cites two cases: *Turnbull v. Topeka State Hospital*, 255 F.3d 1238 (10th Cir. 2001), and *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998). We disagree that the isolated incidents in this case, viewed objectively, could be deemed "severe."

More specifically, we conclude that *Turnbull* and *Lockard* are inapposite. In *Turnbull*, we considered reasonable a jury finding that a hostile work environment had been created where a female psychologist was sexually assaulted by a male patient. 255 F.3d at 1242, 1244–45. The patient attacked her by knocking her to the ground, "undress[ing] her and digitally penetrat[ing] her." *Id.*

- 20 -

at 1242.  He also "bit and choked her, and repeatedly threatened to kill her."  *Id.*

at 1242–43.  As a result, she suffered post-traumatic stress disorder.  *See id.* at

1243.  In addressing the sufficiency of the evidence as to the issue of severity in

the work environment, we first noted that, while "an isolated incident may suffice

if the conduct is severe and threatening," frequency is "one factor in the

analysis."  *Id.*  Nonetheless, we found the relevant conduct in that case

sufficiently "severe and threatening" due to its "objectively abusive[ and]

dangerous" nature.  *Id.* at 1243–44.

Similarly, the plaintiff in *Lockard* was subjected to demonstrably severe

and inappropriate conduct.  *See* 162 F.3d at 1072.  Specifically, she was a

waitress who had to experience "'filthy' comments . . . such as 'I would like to

get into your pants'" made by two customers.  *Id.*  One customer also "pulled her

hair," and "grabbed her breast and placed his mouth on it."  *Id.*  As a result of the

incident, she "testified that . . . her emotional condition deteriorated to the point

that she feared going out in public."  *Id.*  We found "the harassing conduct by the

two male customers . . . sufficiently severe to create an abusive environment."  *Id.*

The incidents in *Lockard* and *Turnbull* are quite plainly distinguishable

from the isolated incidents in this case.  They both involved instances of sexual

assault—conduct that clearly could be objectively viewed as threatening and

severe.  *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir.

2002) ("Rape is unquestionably among the most severe forms of sexual

harassment. Being raped by a business associate, while on the job, irrevocably alters the conditions of the victim's work environment."); 3 Larson, *supra*, § 46.05[3][b], at 46-82 (noting that "a single incident of physical assault against a co-worker that is motivated by anti-female animus can qualify as severe enough to constitute an alteration of the co-worker's conditions of employment"). Consistent with our conclusions in *Lockard* and *Turnbull*, other courts have required the conduct to be especially egregious or extreme where only isolated incidents are alleged. *See, e.g.*, *Smith*, 189 F.3d at 534 (noting that, "[a]lthough less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level, 'extremely serious' acts of harassment do not," and finding that "[b]reaking the arm of a fellow employee because she is a woman, or, as here, damaging her wrist to the point that surgery was required, because she was a woman, easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment"); *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) (noting that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); *see also Jacob v. ES-O-EN Corp.*, No. 2:06-CV-740 TC, 2008 U.S. Dist. LEXIS 12742, at *8 (D. Utah Feb. 19, 2008) ("[Plaintiff's] allegations of rape and assault by [an employee] amount to [a] hostile work environment, because these actions could be severe enough to alter [her] conditions of employment and create an abusive work environment.");

*Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F. Supp. 2d 953, 970 (D. Minn. 1998) ("A single sexual assault has a far greater potential to adversely alter the work environment, and with greater permanence, than would an offensive verbal remark, or a series of such remarks."); *cf. Patterson v. Cnty. of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004) (holding in a 42 U.S.C. §§ 1981 and 1983 context that, "[a]lthough a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, . . . [where the plaintiff was subjected to] a physical assault in which [he] was punched in the ribs and . . . temporarily blinded by having mace sprayed in his eyes[,] [w]e cannot say that, as a matter of law, such an incident is not sufficiently severe, in all the circumstances, to create a hostile work environment"). The facts presented in this case do not rise to the extreme level of conduct described in the foregoing cases.

While Dr. Mahan's conduct (construing the facts in the light most favorable to Ms. Morris) was unquestionably juvenile, unprofessional, and perhaps independently tortious, viewed in context, we cannot conclude from this record that it objectively altered the terms and conditions of Ms. Morris's employment. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII is not a federal guarantee of refinement and sophistication in the workplace—in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive."); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that

- 23 -

may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." (internal quotation marks omitted)); *cf. Chavez*, 397 F.3d at 833 ("Title VII is not a code of workplace conduct, nor was it 'designed to bring about a magical transformation in the social mores of American workers[.]'" (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995))); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (suggesting that Title VII is "not designed to purge the workplace of vulgarity").

Even the pericardium incident, as distasteful as it seemingly was, does not change our conclusion that, viewed objectively, Dr. Mahan's conduct did not alter the terms and conditions of Ms. Morris's employment, specifically because, considering the totality of the circumstances, this incident could not reasonably be viewed as threatening or severe. *See Turnbull*, 255 F.3d at 1243 ("[A]n isolated incident may suffice if the conduct is severe and threatening."). Although certainly not determinative, we cannot ignore the surgical context in which this incident occurred in making the latter assessment from an objective perspective. As noted, "[c]onduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another." *Fairbrook Med. Clinic*, 609 F.3d at 328; *see Gross*, 53 F.3d at 1537 ("In determining whether Gross has established a viable Title VII claim, we must first examine her work environment. In the real world of construction work, profanity and vulgarity are not perceived as hostile or

abusive. Indelicate forms of expression are accepted or endured as normal human behavior."). In the surgical context, unlike many employment settings, workers regularly see, and otherwise encounter, human tissue, blood, and other bodily fluids of other human beings. It is logical to conclude that, at least with respect to an isolated incident, such workers are objectively less likely than workers employed in an unrelated context to be threatened when their clothed body comes into contact with such human biological products, or to view clothed-body contact with such products—albeit unwelcome as here—to be severe. In other words, a reasonable worker in the surgical context would be less likely than workers in an unrelated context to perceive such clothed-body contact with human biological products to be threatening or severe.[7]

---

[7] Lest there be any confusion, we clarify that we are not asserting that, under an objective inquiry, a reasonable nurse or other healthcare worker in a surgical or related context may never predicate a hostile work environment claim on exposure to human biological products. For example, if a physician, operating on a patient suffering from a deadly and communicable disease, like acquired immune deficiency syndrome ("AIDS"), "took one of the surgical drapes containing the patient's blood and surgical refuse and threw it," *Grantham v. Vanderzyl*, 802 So.2d 1077, 1079 (Ala. 2001), at a nurse, and it landed on the front of her unmasked face, that nurse might secure a different result than Ms. Morris on the question of whether a reasonable employee in her situation would perceive the conduct as threatening or severe, *cf. id.* at 1081 (concluding that the nurse plaintiff's claim under the tort of outrage was legally insufficient, in that "there must be some basis in fact for her fear of developing a disease from exposure to the patient's blood" but the plaintiff "was never in danger of contracting a communicable disease as the result of the operating-room incident"). That said, we do not definitively comment upon what the outcome would be on such facts; suffice it to say, that is not the case before us.

Indeed, Ms. Morris's own response sheds some light on this objective inquiry—regarding how a reasonable person in this surgical setting would perceive the pericardium incident. And, although we need not definitively opine on the matter, it also suggests that, in fact, she did not subjectively view the incident as severe. Ms. Morris did not deny that, as a surgical nurse, this was not the first time she had blood on her scrubs when not wearing protective gear, although she insisted that this was not a common event. Furthermore, Ms. Morris did not report the incident for several days, asserting that she "didn't want to interrupt" her supervisor's holiday weekend, Aplt. App. at 135, and she continued to work with Dr. Mahan for roughly three months after the incident. Reflecting "[c]ommon sense, and an appropriate sensitivity to social context," *Oncale*, 523 U.S. at 82, we conclude that even the pericardium incident does not permit us to conclude that a reasonable person in Ms. Morris's position would have viewed the alleged sexual harassment to be threatening or severe, *see, e.g.*, *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 862 (8th Cir. 2009) (concluding that there was insufficient evidence of a hostile work environment where the plaintiff's manager engaged in unwanted touching on various occasions and made other inappropriate suggestions); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246–47 (11th Cir. 1999) (collecting cases determining that harassing conduct was not sufficiently severe to be actionable discrimination under Title VII).

"[D]raw[ing] all reasonable inferences in favor of [Ms. Morris]" on this issue, *EEOC v. PVNF, LLC*, 487 F.3d 790, 797 (10th Cir. 2007), we conclude on this record that a reasonable jury could not determine that Ms. Morris experienced a hostile work environment due to sexual discrimination. There is no indication that the relatively isolated incidents in this case "altered the terms or conditions of [Ms. Morris's] employment and created an abusive working environment." *Pinkerton*, 563 F.3d at 1058 (quoting *Medina*, 413 F.3d at 1134) (internal quotation marks omitted). For that reason, the district court properly dismissed her Title VII hostile work environment claim.[8]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal under Rules 12(c) and 56(a), and its accompanying judgment.

---

[8] In its response brief, Memorial argues that, even if Ms. Morris could establish actionable harassment, it is not liable for the harassment because "it took appropriate action in response." Aplee. Br. at 35. The district court did not address this argument. For the reasons discussed, Ms. Morris's claim fails to establish actionable harassment under Title VII; thus, we need not address this alternative ground for affirming the district court's judgment in favor of Memorial and the City of Colorado Springs.