Michael **WILLIAMS**, Appellant,

v.

**DISTRICT OF COLUMBIA,**
et al., Appellees.

No. 09–CV–1192.

District of Columbia Court of Appeals.

Argued Oct. 14, 2010.

Decided Dec. 9, 2010.

John M. Clifford, with whom Stephanie J. Bryant, and Billie Pirner Garde, Washington, DC, were on the brief, for appellant.

Richard S. Love, Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, and Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellees.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and NEBEKER, Senior Judge.

THOMPSON, Associate Judge:

On April 8, 2009, appellant Michael Williams filed a complaint against the District of Columbia ("the District"), Mayor Adrian Fenty, and Clark Ray, then-Director of the District of Columbia Department of Parks and Recreation ("DPR") asserting that he had been terminated

from his position with DPR in violation of the District of Columbia Whistleblower Protection Act ("DC–WPA" or "Act"), D.C.Code §§ 1–615.51 to –59 (2001). He also asserted claims for defamation and intentional infliction of emotional distress. The defendants brought a motion to dismiss, which the trial court granted, finding that Williams failed to state a claim for relief for each of the three causes of action because: (1) he did not allege facts showing that he made a "protected disclosure" under the DC–WPA; (2) his defamation claim lacked sufficient specificity; and (3) the circumstances of his termination did not rise to the "extreme and outrageous" level required to sustain an intentional infliction of emotional distress claim. On appeal, Mr. Williams argues that the trial court's judgment granting the motion to dismiss should be reversed.

We affirm the trial court's ruling as to Williams's DC–WPA and intentional infliction of emotional distress claims, but reverse and remand as to his defamation claim.

## I.

For purposes of our review of the trial court's ruling granting defendants' motion to dismiss, we must accept as true, and we view in the light most favorable to appellant Williams, the following allegations set out in the complaint. *Wanzer v. District of Columbia*, 580 A.2d 127, 129 (D.C.1990). In January 2008, Williams was hired as the Associate Director of Athletic Programs for DPR, a position in which he was "responsible for the administration of DPR's youth basketball leagues." The rules of the youth basketball league established that children ages six through eight play in the "Pee Wee" division, and children ages nine and ten play in the "Pony" division. The rules provided that a child's age was to be determined on April 5 of each year,

and therefore a player who had turned or would turn nine before April 5, 2009 was not eligible to play in the Pee Wee division in 2009, but instead should play in the Pony division. The rules, which were "designed 'to provide a safe, healthy and positive environment for all youth participants,' " also required each child to provide DPR with documentation that included age verification.

On or about February 11, 2009, DPR staff members notified Williams that "they were receiving calls from members of the public" who were complaining that Mayor Fenty's twin sons were playing in the Pee Wee league even though they were "ineligible" because they would turn nine years old on March 8, 2009. Two days later, Williams "learned of additional complaints [about Mayor Fenty's children] from parents of younger children." Williams called Sean Conley, a personal aide to Mayor Fenty, to ask about Fenty's children, and Conley "admitted that Defendant Fenty's children were playing in a younger division in violation of the rules ... [and] confirmed that Defendant Fenty was aware of the violation."

On February 13, 2009, Williams called Ray, his supervisor, to tell him the "facts he had learned" about Mayor Fenty's children. Ray "admitted that Defendant Fenty's children were playing in violation of the rules [and] promised to ... get advice on how to handle the situation." On February 17, 2009, Ray "told [Williams] that Defendant Fenty's children were going to continue to play in the Pee Wee division." That day, Williams asked "an associate" to contact Mayor Fenty "to discuss the situation." On February 18, 2009, the associate told Williams that Mayor Fenty responded to his inquiry "by cursing and belittling the associate."

On February 23, 2009, Ray informed Williams that he was being terminated

from his job effective March 9, 2009. Ray told Williams that he was being terminated for budgetary reasons, but, in response to Williams's questions about why he was being fired, also told Williams, "[Y]ou are smart and can figure it out."

On March 25, 2009, Williams testified before the Council of the District of Columbia (the "Council") about his termination and his allegations regarding Mayor Fenty's sons' participation in violation of the basketball league rules. He asserts in his complaint that "agents and employees" of the District retaliated against him "by publishing and/or republishing false and defamatory 'explanations' for his abrupt termination," specifically, that Williams was terminated for embezzlement. The complaint further asserts that "[o]n information and belief, a senior official of the District of Columbia government who was displeased with" Williams's allegations of retaliatory termination and with his testimony before the Council "initiated publication of the false rumor." It also asserts that "[i]ndividuals who are present and former employees of DPR and/or are active in youth sports activities" called Williams "to tell him that the (false) rumor accusing him of embezzlement is 'out there' in the community."

On August 27, 2009, the trial court granted the defendants' motion to dismiss Williams's complaint. This appeal followed.

## II.

■ We review the trial court's order granting the motion to dismiss de novo. *Duncan v. Children's Nat'l Medical Ctr.*, 702 A.2d 207, 210 (D.C.1997). To survive a motion to dismiss, a complaint "must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these ele-

ments exist." *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C.2007) (internal quotation marks omitted). We consider each issue in turn.

## A. The Whistleblower Claim

■ The DC–WPA establishes that "the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C.Code § 1–615.51 (2001). The Act prohibits a supervisor from taking a "prohibited personnel action," including terminating an employee, in retaliation for that employee's having made a "protected disclosure." D.C.Code §§ 1–615.52, 53 (2001). Under the DC–WPA, a "protected disclosure" is defined as a "disclosure," to a "supervisor or a public body," of information that the employee "reasonably believes evidences" either gross mismanagement, gross misuse or waste of public resources or funds, substantial and specific danger to the public health and safety, or—pertinent to Williams's allegations—"[a]buse of authority in connection with the administration of a public program or the execution of a public contract" or a "violation of a federal, state, or local law, rule or regulation[.]" D.C.Code § 1–615.52(a)(6) (2001). To establish a prima facie case under the DC–WPA, Williams was required to allege facts establishing that he made a protected disclosure, that a supervisor retaliated against him by taking a prohibited personnel action against him, and that his protected disclosure was a contributing factor to the retaliation or prohibited personnel action. *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C.2008).

Williams asserted in his complaint that he reasonably believed that Mayor Fenty's sons' participation in the Pee Wee league

evidenced an "abuse of authority in connection with the administration of a public program and a violation of a DPR rule or regulation." He alleged, as Count I of his complaint ("Termination in Violation of the Whistleblowers' Protection Act"), that because "he raised concerns about Defendant Fenty's abuse of authority" that amounted to "protected disclosures," "Defendants Fenty and Ray used their authority to cause [his] termination" in "retaliation for his activities as a whistleblower."

In considering defendants' motion to dismiss, the trial court reasoned that the "determining factor is whether plaintiff's information already was in the public domain." Citing *Meuwissen v. Dep't of Interior*, 234 F.3d 9 (Fed.Cir.2000) (applying the federal whistleblower statute),[1] the trial court found that because Williams's complaint acknowledged that the information he conveyed to Ray "already was known by members of the public," the information was in the public domain and therefore did not qualify as a "protected disclosure" within the meaning of the Act.

In *Wilburn*, we quoted the statement in *Meuwissen* that "a disclosure of information that is publicly known is not a disclosure under the WPA, whose purpose is to protect employees who possess knowledge of wrongdoing that is concealed ... and who step forward to help uncover and disclose that information[.]" 957 A.2d at 925 (quoting 234 F.3d at 13) (internal quotation marks omitted). This statement formed the basis of our observation that it was "questionable whether Wilburn's conveyance of information ["information that had been known for some time both within and outside OHR"] was a 'disclosure' at all." *Wilburn*, 957 A.2d at 925. Ultimately, however, we did not decide whether Wilburn had made a "disclosure" within

the meaning of the Act, but simply assumed that she had done so, and decided the case on the ground that the information she conveyed was not about any of the types of abuse or violations enumerated in the statute. *Id.* at 926.

■■ Appellees urge us to decide the issue we avoided in *Wilburn* and to conclude, as the trial court did, that Williams did not make a protected "disclosure" since, as alleged in the complaint, the information he reported was publicly known (i.e., known to some parents as well as to some DPR staffers and at least one "DPR senior staff person"). We decline to adopt a reading of the DC–WPA that would protect employees who have conveyed to their supervisors information about the existence of an abuse of the type enumerated in the Act only in instances in which no one in the general public is aware of the abuse. Such a reading would not comport with the purpose of the Act, which is to foster an environment in which District employees feel free to expose abuses to their superiors who are in a position to "recommend or take remedial or corrective action[.]" D.C.Code § 1–615.52(a)(8) (2001). But on the specific facts alleged in Williams's complaint—not only public knowledge but also vocalized public concern about the very information that Williams conveyed—we agree that Williams's actions fell outside the protection of the DC–WPA. Williams alleged that on or about February 11, 2009, there were "calls from members of the public" complaining about violations of the DPR Rules; that on February 13, 2009, he "learned of additional complaints from parents of younger children"; and that he "was concerned that the facts would be reported in the press." In short, Williams

---

1. This court has recognized that the federal whistleblower statute, and its accompanying federal case law, are instructive in interpreting the DC–WPA. *Wilburn*, 957 A.2d at 925.

alleged that he made a "disclosure" to his supervisor in circumstances in which members of the public had already been vocal enough to DPR that Williams believed the alleged abuse would be addressed by the press.[2] The premise of the DC–WPA, however, is that District employees "can function as the 'eyes and ears' of District taxpayers."[3] Like other whistleblower statutes, it was enacted to "protect employees who risk their own personal job security for the benefit of the public."[4] In the circumstances alleged in the complaint—members of the public having themselves perceived an alleged abuse, and already vociferously and repeatedly drawing attention to it—the purpose of the Act does not demand that we recognize Williams's relaying of the public's complaints as a protected disclosure.[5] We do not doubt that Williams's "disclosure" was commendable and well-intentioned, but he did not bring himself within the protection of the DC–WPA and was "not serving [its particular] purpose ... by disclosing what [was] already known"[6] and being reported to DPR. We therefore uphold the trial court's dismissal of Williams's Count I DC–WPA claim.

■ Because Williams's Count I DC–WPA claim fails, his Count II DC–WPA also fails. Count II, "Retaliatory Defamation in Violation of the Whistleblowers' Protection Act," is based on Williams's allegation that the defendants retaliated against him for testifying at a Council hearing about his "termination in violation of the [DC–WPA]." Specifically, he alleged that defendants retaliated by "spreading ... defamatory 'explanations'" about the reason for his termination. Nothing in the record suggests that the Council or the public was already aware of the (alleged) "termination in violation of the [DC–WPA]," so Williams's testimony to the Council in which he made that allegation would seem to qualify as a "disclosure" to a "public body" within the meaning of the DC–WPA. D.C.Code § 1–615.52(a)(6). But, to make a "protected disclosure" to the Council, Williams had to disclose information that he "reasonably believe[d] evidence[d]" the type of unlaw-

---

2. *Cf. Horton v. Department of the Navy*, 66 F.3d 279, 282 (Fed.Cir.1995) (noting that the purpose of the Whistleblower Protection Act is to encourage disclosure of wrongdoing, such as by "disclosure to the press").

3. D.C. Council, District of Columbia Whistleblower Protection Act of 1998, Committee on Government Operations, Report on Bill 12–191, at 3 (April 28, 1998).

4. *Willis v. Department of Agric.*, 141 F.3d 1139, 1143 (Fed.Cir.1998).

5. In December 2009, the Council passed the Whistleblower Protection Amendment Act of 2009, D.C. Law 12–160, in which it amended the DC–WPA definition of "protected disclosure" so that the term explicitly includes "any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, *or prior disclosure made to any person by an employee or applicant,* including a disclosure made in the ordinary course of an employee's duties, ..." 57 D.C.Reg. 896 (2010); D.C.Code § 1–615.52(a)(6) (2010) (emphasis added). We agree with appellees that the language we have italicized reflects the Council's focus on protecting employees or applicants who risk their job security to disclose information that might have already been disclosed by another employee or applicant, *not* on protecting employees' or applicants' conveyance of information that is the subject of discussion among, and that has already been the subject of complaints by, concerned members of the general public. Stated differently, retaliation against an employee who relays public complaints about a perceived abuse (and who persists in trying to rectify the situation complained of, even when his superiors say "stop") may well merit reproach, but it does not appear to be the particular evil at which the DC–WPA was aimed.

6. *Meuwissen,* 234 F.3d at 14.

ful activity or abuse at which the DC–WPA is directed—i.e., information indicating that DPR committed "such serious errors ... that a conclusion the agency erred is not debatable among reasonable people." *Wilburn,* 957 A.2d at 925 (quoting *White v. Department of the Air Force,* 391 F.3d 1377, 1382 (Fed.Cir.2004)).[7] We concluded above, however, that Williams's relaying of public complaints to his supervisor was not a "protected disclosure," meaning (1) that reasonable people could have viewed Williams's termination (allegedly) because of that non-protected disclosure as not "such [a] serious error[ ]," *id.;* and (2) that Williams's Count II allegation—that defendants retaliated against him for disclosing to the Council what reasonable people might regard as the not-so-seriously-erroneous (alleged) reason for his termination—fails to state a viable DC–WPA claim. For that reason, we affirm the dismissal of Count II.

**B. The Defamation Claim**

 As recounted above, Williams alleged in his complaint that "[o]n information and belief, a senior official of the District of Columbia government who was displeased with Plaintiff's allegations of unlawful, retaliatory termination and his testimony to the Council Committee, initiated publication of the false rumor" that Williams "was terminated for 'embezzlement[.]'" He further alleged that "[i]ndividuals who are present and former employees of DPR and/or are active in youth sports activities" had called him "to tell him that the (false) rumor accusing him of embezzlement is 'out there' in the community." The trial court dismissed this defamation claim because it determined that Williams "fail[ed] to identify who allegedly

made the statement, when it allegedly was made and to whom it allegedly was made." We review this ruling de novo. *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 877 (D.C.1998).

 "In the District of Columbia, 'a statement is defamatory if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" *Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C.2000) (quoting *Howard University v. Best,* 484 A.2d 958, 989 (D.C. 1984)). In order to state a claim for defamation, a plaintiff must show "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Beeton v. District of Columbia,* 779 A.2d 918, 923 (D.C. 2001) (internal quotation marks and citations omitted). Our focus in determining whether a complaint for defamation was properly dismissed is "whether the factual allegations ... are sufficient to permit [appellees] to form responsive pleadings" to appellant's claim of defamation. *Solers, Inc. v. Doe,* 977 A.2d 941, 948 (D.C.2009) (noting that we do not apply a heightened pleading standard to defamation claims) (quoting *Oparaugo v. Watts,* 884 A.2d 63, 77 (D.C.2005)).

Both Williams and appellees rely on *Crowley v. North Am. Telecomm. Ass'n,* 691 A.2d 1169 (D.C.1997), to bolster their arguments with regard to the defamation claim. Plaintiff Crowley was terminated

---

7. We do not reach appellees' argument that the matter that Williams reported to his supervisor was at most a "trivial," "technical" violation that was not the type of abuse that reasonable people would agree was sufficiently serious to be the basis of a DC–WPA claim.

from his job at the North American Tele-communications Association ("NATA"). He alleged in his complaint that on March 1, 1995, Boland, his former supervisor, made defamatory statements about him to Crowley's former co-workers. *Id.* at 1171. His complaint set out "the substance of the alleged defamatory statement" ("that an empty bullet casing found in the hallway was probably left by Crowley," *id.* at 1172), "the identification by employment of the persons" to whom the statement was made, and the date of the alleged statement. *Id.* It also identified by name the speaker of the alleged defamatory statement. *Id.* Given that the complaint contained that identifying information, we concluded that it was sufficient to withstand a motion to dismiss. *Id.*[8]

We are satisfied that Williams's complaint passed muster under *Crowley* and should not have been dismissed at the pleading stage. It alleged the substance of the alleged defamatory statement, i.e., that the plaintiff was "terminated for 'embezzlement.'" Similar to the complaint in *Crowley*, it "identif[ied] by employment" the persons to whom the statement was allegedly made: "[i]ndividuals who are present and former employees of DPR and/or are active in youth sports activities." Although it does not allege a specific date or dates on which defamatory statements were made, it attributes the defamatory statement to a senior District official "who was displeased with Plaintiff's allegations of unlawful, retaliatory termination *and* his testimony to the Council Committee" (emphasis added) and thus

fixes the date or dates at a time after Williams's testimony before the Council ("on March 25, 2009") and before April 8, 2009, the date on which Williams filed his complaint. In *Oparaugo*, we found sufficient a complaint that alleged facts that narrowed the time of publication of a defamatory statement to a 22–month window. 884 A.2d at 77 (observing that "the time period within which [the defamatory statement] was published is apparent, i.e., between the date of [appellee's] letter (April 4, 1998) and the time that it was first shown to appellant by [a third party] (February 2000)"). Despite the absence of an allegation about a more precise date, we concluded that the plaintiff's allegations were "sufficient to permit appellees to respond[.]" *Id.* at 78. We conclude the same as to Williams's complaint, which points appellees to a two-week period during which the alleged defamatory explanations for his termination were made.

■■■ Finally, we consider the fact that, unlike the complaint in *Crowley*, Williams's complaint did not identify the speaker of the alleged defamatory statement. *Crowley*, 691 A.2d at 1172. Appellees argue that, in alleging who "initiated publication of the false rumor that [he] was terminated for 'embezzlement,'" the complaint is insufficiently precise, specifying only a "categorization[ ] which can include hundreds, if not thousands, of persons," and requiring appellees "to interview an unreasonably large pool of persons" to answer the complaint. We disagree. Williams alleged that "a senior official of the District of Columbia government who was dis-

---

8. By contrast, in *Watwood v. Credit Bureau, Inc.*, 68 A.2d 905 (D.C.1949), the plaintiff alleged merely that the defendants had "furnished certain written reports and information" to an individual "in which the defendants made false and libelous statements as to the financial situation of the plaintiff, as to her marital status and other libelous information which was untrue and false." *Id.* at 905. Because the complaint contained "neither the [alleged defamatory] language nor its substance," and contained "a bare legal conclusion" about "libelous" statements "with nothing in the complaint to support the conclusion," it was insufficient to state a claim. *Id.* at 906.

pleased with [his] allegations of unlawful, retaliatory termination and his testimony to the Council Committee" initiated a false rumor about the reason for his termination. We think the subset of "senior" District officials who would have been "displeased with [Williams's particular] allegations ... and ... testimony"[9] is not so large that Williams's claim should be foreclosed before any discovery has been conducted.[10] What is called for at the motion to dismiss stage is simply " 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Williams's complaint states enough about the individuals ("[i]ndividuals who are present and former employees of DPR and/or are active in youth sports activities") who called him to tell Williams about the rumor of embezzlement to give appellees (and Williams) a sufficient focus with which to begin discovery.[11] *Cf. Altschuler v. Univ. of Pennsylvania Law School*, 1997 WL 129394, at *10, 1997 U.S.

Dist. LEXIS 3248, at *26 (S.D.N.Y. Mar. 20, 1997) (concluding that complaint that attributed alleged defamatory statements to "a professor or administrator at the University of Pennsylvania law school who was talking about plaintiff to a member of [a law firm's] hiring committee," was "not so vague or conclusory as to require dismissal"). Accordingly, we reverse the dismissal of Williams's defamation claim and remand for further proceedings.

## C. The Intentional Infliction of Emotional Distress Claim

■ The final count of Williams's complaint was that he "suffered severe emotional distress" as a result of appellees' "extreme and outrageous" conduct that "abruptly terminat[ed]" his "successful career." The trial court dismissed this claim on the ground that the conduct complained of did not rise to the necessary level of outrageous conduct.

■ In order to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intention-

9. As discussed *supra*, in the DC–WPA counts of his complaint, Williams alleged that the spreading of false rumors about the reason for his termination constituted a retaliatory, prohibited personnel action. Under the DC–WPA, it is a "supervisor" who is prohibited from taking such an action. D.C.Code § 1-615.53. A "supervisor" is "an employee having authority, in the interest of an agency, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to evaluate their performance, or to adjust their grievances, or effectively to recommend such action" or an individual who "has the authority to effectively recommend or take remedial or corrective action for the [abuse] that an employee may allege or report...." D.C.Code § 1-615.52(a)(8) (quoting D.C.Code § 1-617.01(d)). Thus, the "inference[ ] to be drawn from the complaint," *Chamberlain*, 931 A.2d at 1023, is that the

person or persons who allegedly spread the false rumor about Williams's termination were individuals with authority to take a personnel action against Williams or to correct the youth basketball irregularity that he described—i.e., Williams's former superiors in DPR or their superiors, rather than (the much larger class of) any senior official in the District of Columbia government.

10. Appellees successfully moved to stay discovery pending a ruling on their motion to dismiss.

11. In the meantime, as necessary and appropriate, defendants can answer the defamation allegations by stating that they are "without knowledge or information sufficient to form a belief as to the truth of [Williams's] averment[s]," a statement that "has the effect of a denial." Super. Ct. Civ. R. 8(b).

ally or recklessly (3) causes the plaintiff severe emotional distress." *Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C.2003). To survive a motion to dismiss his intentional infliction of emotional distress claim, Williams needed to allege in his complaint conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991).

"We have been exacting as to the proof required to sustain such claims in an employment context," *Futrell*, 816 A.2d at 808, because "generally, employer-employee conflicts do not rise to the level of outrageous conduct." *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C.1997). For example, in *Crowley*, discussed *supra*, plaintiff Crowley alleged that his supervisor terminated him and then defamed him, causing him to suffer intentionally inflicted emotional distress. *Id.* at 1171. We affirmed the dismissal of his intentional infliction of emotional distress claim, stating that "[s]uch circumstances are not the type for which liability may be imposed for this particular tort." *Crowley*, 691 A.2d at 1171. Williams's intentional infliction of emotional distress claim can fare no better.[12] Therefore, we uphold the trial court's dismissal of the claim.

For the foregoing reasons, we affirm the trial court's ruling dismissing Williams's DC–WPA and intentional infliction of emotional distress claims, but reverse as to the dismissal of his defamation claim and remand for further proceedings consistent with this opinion.

*So ordered.*

---

**12.** Williams relies on this court's statement in *Best*, 484 A.2d at 986, that "[a]ctions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress." In *Best*, however, we cited the public policy behind the D.C. Human Rights Act in concluding that allegations of sexual harassment in the workplace stated a claim for intentional infliction of emotional distress. *See id.* Our conclusion, *supra*, that Williams's complaint did not state a claim for a violation of the DC–WPA undermines his argument that the conduct he complains of similarly violated public policy. Williams's claim is more akin to the intentional infliction of emotional distress claim that we dismissed in *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C.1997), where we held that allegations that an employer manufactured evidence to establish a claim of sexual harassment against an employee, demoted him, and leaked the information to other employees did not "rise to the level of outrageous conduct" necessary to state a claim for intentional infliction of emotional distress. *Id.* (quoting *Best*, 484 A.2d at 986).