# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 19, 2015         Decided August 4, 2015

No. 13-7189

KRISTOPHER BAUMANN, CHAIRMAN OF THE FRATERNAL
ORDER OF POLICE, METROPOLITAN POLICE DEPARTMENT
LABOR COMMITTEE,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01189)

———

*Anthony M. Conti* argued the cause for appellant. With him on the briefs was *Daniel J. McCartin*. *Gregory T. Lawrence* entered an appearance.

*Mary L. Wilson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: GARLAND, *Chief Judge*, and ROGERS and PILLARD, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Pursuant to Metropolitan Police Department ("MPD") General Order 204.01, Part VI-C-1, the Chief of Police sanctioned Kristopher Baumann for releasing to the media a recording of Emergency Response Team ("ERT") radio communications that occurred during an incident in which a suspect exchanged gunfire with the police and barricaded himself inside a private home.  The General Order does not prevent members of the MPD from speaking publicly about events like the barricade incident.  Part VI-C-1, however, prohibits the public disclosure of confidential MPD information whose release may jeopardize ongoing law enforcement investigations, and two such criminal investigations related to the barricade were pending when Baumann gave the recording to reporters shortly after the incident.  Baumann sued the District of Columbia and MPD officials on the ground that he was being punished for protected speech in violation of the First Amendment to the United States Constitution and the District of Columbia Whistleblower Protection Act ("DCWPA"), and now appeals the grants of summary judgment to the defendants on his First Amendment and DCWPA claims and dismissal of his DCWPA claim against the individual defendants.

Baumann has conceded that an MPD Order requiring officers to notify MPD before releasing confidential MPD information that may jeopardize ongoing law enforcement investigations would be constitutional, as would a sanction for failing to do so.  His only contention under the First Amendment is that his punishment was unconstitutional because the MPD has not shown that release of the ERT recording could or did impede any law enforcement investigation or otherwise

disrupted the MPD's operations. We hold that Part VI-C-1 as applied to Baumann is sufficiently tailored temporally and in scope to enable law enforcement better to investigate criminal activity and police operations implicating police safety, and that the MPD's interests in non-disclosure outweigh Baumann's and the public's interests in releasing the recording at the time he did. Part VI-C-1 bars disclosure of confidential information only during ongoing investigations and does not otherwise bar speech about police activity, including the barricade incident. And releasing the confidential ERT recording could have harmed pending criminal investigations because it contained potentially critical information about the barricade and, only if kept confidential, could it provide a means to gauge other evidence offered by witnesses and persons involved in the incident. Baumann's statutory challenge under the pre-2010 DCWPA is unavailing for failure to identify a "protected disclosure," D.C. Code § 1-615.52(a)(6) (2001). Accordingly, we affirm.

## I.

MPD General Order 204.01 states that it is the policy of the MPD that officers "shall make available to the news media timely information pertaining to matters within the scope of the [MPD], except in those rare instances where the law enforcement process or fair administration of justice might be hampered by premature disclosure of such information." Gen. Order 204.01, Part II. Consistent with that policy, officers "may provide the basic facts, unless otherwise restricted by this General Order, concerning an event or incident of which they have sufficient knowledge, in conjunction with a Unit Official's approval, the rank of lieutenant or above." *Id.* Part VI-A-1. And they may, for example, generally disclose to the public "[f]actual information concerning an individual involved in an incident" and the "[c]ircumstances surrounding an incident." *Id.*

Part VI-B-1 & 2. But the Order specifies in Part VI-C that certain information cannot be released to the public on an officer's own initiative. In particular, Part VI-C-1 prohibits the disclosure of "[c]onfidential information that may jeopardize the successful conclusion of an investigation." Likewise, Part VI-C-7 states that "[a]ll documents not listed as releasable shall be closed to public inspection."

Kristopher Baumann is an MPD police officer who was serving full time as Chairman of the Fraternal Order of Police Metropolitan Labor Committee ("union") on May 30, 2009, when the ERT was called to the scene of a barricade incident during which gunfire had been exchanged with the police. Several ERT members expressed concern to Wendell Cunningham, an ERT member and vice-chairman of the union, that higher-ranking officials, including the Mayor, had demanded that tear gas be used during the barricade, notwithstanding the recognized hazards of, and their lack of training for, its use in such situations. Cunningham and other police officers informed Baumann, who was not at the barricade, of the tear-gas issue and shared with him other safety concerns about how the incident had been handled. During a union leadership meeting on June 1, Baumann told Cunningham to initiate a union safety committee investigation into the incident.

The following day, a reporter told Baumann that he had received conflicting information from MPD officials about whether there had been an order to use tear gas at the barricade and suggested that Baumann should review the recording of the ERT's communications during the incident. Baumann told Cunningham to get the ERT recording, and Cunningham sent an email to the MPD's Office of Unified Communications ("OUC") requesting the recording for "incident review" purposes. On June 5, the OUC gave Cunningham a copy of the recording upon his signing a receipt stating "[i]t is understood

[that] the following recording[] [is] for internal investigation only . . . , there are no public requests for . . . the[] incident[]," and "the recording [] will not be released to the public without prior, written approval from the [OUC]." The same day, Baumann listened to the recording and released a portion of it to two reporters.

On June 11, Baumann emailed Assistant Chief Alfred Durham and others, forwarding and commenting on a chain of emails among MPD officials regarding officers' safety concerns at the barricade. Baumann wrote that the email chain revealed that Assistant Chief Patrick Burke had violated the Collective Bargaining Agreement ("CBA") between the MPD and the union — by, for example, failing to recognize the legitimacy of the request of the union safety committee to meet with him and Assistant Chief Durham and stating that the committee is subject to the chain of command — and the D.C. Code.

In early June, Chief of Police Cathy Lanier ordered the Internal Affairs Division ("IAD") to investigate the barricade incident, including, in particular, how the media had obtained the ERT recording. The IAD interviewed Baumann twice. On June 19, Baumann explained it was his understanding that the IAD investigation related to certain information that had been given to the union safety committee to determine "whether or not there were any violations or threats to Public Safety." Baumann told the IAD that his interview responses constituted a protected disclosure. Noting that he was not present at the barricade, Baumann otherwise declined to answer questions that he claimed impermissibly related to his duties as union chairman. On July 14, after being told he would be charged with failing to obey orders and directives if he did not respond to the IAD's questions, Baumann admitted that he had given the ERT recording to two reporters.

The IAD recommended that Baumann be disciplined for releasing the ERT recording to the media without prior authorization, and he was served with a Notice of Proposed Adverse Action on October 9, 2009. The Final Notice of Adverse Action, dated December 29, 2009, ordered Baumann suspended for five working days because he had violated (1) Part VI-C-1 and Part VI-C-7 of General Order 204.01 by releasing the ERT recording to the media without prior written approval from the OUC or the MPD, and (2) General Order 120.21, Part A-25, which, as relevant, prohibits "[a]ny conduct not specifically set forth in this order, which is prejudicial to the reputation and good order of the police force." Baumann appealed to Chief Lanier. On February 5, 2010, the Chief affirmed the first charge under Part VI-C-1, noting that "[t]he recording [Baumann released] was related to two separate ongoing criminal investigations" involving the barricade, one within the MPD and another by the U.S. Attorney's Office, but she dismissed the second, prejudicial-conduct charge and reduced Baumann's suspension to three days. The Chief's appeal decision did not discuss Part VI-C-7 (the residual confidentiality clause) of General Order 204.01, and the MPD does not rely upon it on appeal, so our decision rests only on Part VI-C-1.

Baumann sued the District of Columbia and several MPD officials. As relevant, he alleged that they violated the DCWPA by retaliating against him for his request that Cunningham initiate a safety committee investigation of the barricade, his June 11, 2009 email to MPD officials, and answers he gave during his two IAD interviews, and that they violated the First Amendment by investigating and disciplining him for releasing the ERT recording. The defendants moved to dismiss, and both parties filed motions for summary judgment.

The district court dismissed Baumann's DCWPA claim

against the individual defendants because the statute in effect at the time of the underlying events provided a cause of action only against the District of Columbia, and the later amendment allowing suits against individuals was not retroactive. *Baumann v. District of Columbia* ("*Baumann I*"), 775 F. Supp. 2d 191, 194–96 (D.D.C. 2011). The court also granted summary judgment to the defendants because no reasonable jury could conclude that Baumann made a "protected disclosure" under the DCWPA. *Baumann v. District of Columbia* ("*Baumann II*"), 933 F. Supp. 2d 19, 23 (D.D.C. 2013). In addition, the court granted summary judgment to the defendants on Baumann's First Amendment claim. The court ruled that no reasonable jury could conclude his allegedly protected activity was a substantial or motivating factor in the purportedly retaliatory acts. *Id.* at 36–41. The court further concluded that General Order 204.01 was not an unlawful prior restraint on his speech because the MPD's strong interest in regulating the release of the narrow category of information that would affect the confidentiality and effectiveness of ongoing criminal investigations outweighed Baumann's and the public's interest in releasing such information when he did, especially considering that the General Order did not restrict his ability to express his personal view on safety concerns related to the barricade incident and was time-limited to only when the disclosure might harm an ongoing investigation. *Baumann v. District of Columbia* ("*Baumann III*"), 987 F. Supp. 2d 68, 77–82 (D.D.C. 2013).

Baumann appeals the grants of summary judgment on his First Amendment and DCWPA claims and the dismissal of his DCWPA claim against the individual defendants. Our review is *de novo*. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011); *Wilson v. Pena*, 79 F.3d 154, 160 & n.1 (D.C. Cir. 1996). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The court must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Calhoun*, 632 F.3d at 1261.

**II.**

Baumann contends that the defendants (hereafter "appellees") violated the First Amendment by punishing him for criticizing the MPD through the protected speech of releasing the ERT recording and communicating with the media. In particular, he maintains that the MPD unlawfully undertook the 2009 IAD investigation and disciplined him in response to his release of the ERT recording. On appeal, it does not matter whether Baumann's First Amendment claim is styled as one alleging unlawful retaliation or prior restraint. *Compare O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998), *with Sanjour v. EPA*, 56 F.3d 85, 90 (D.C. Cir. 1995) (en banc). He acknowledged during oral argument that the MPD could create a constitutional policy under which individual officers who want to release documents must alert the MPD in advance. Oral Arg. Rec. 7:14–8:28 (Mar. 19, 2015). He also acknowledged that there may be situations in which the MPD, as employer, could punish its officers for disclosing confidential information whose release did, in fact, undermine an ongoing investigation. *Id*. He contends only that the MPD could not constitutionally investigate and punish him for releasing this ERT recording because the MPD has not shown that its release plausibly could or did impede any investigation, or otherwise disrupted the MPD's operations, and the balancing of interests under *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968), tips in his favor.

As a general matter, "*Pickering* and its progeny continue to be the meter by which the First Amendment rights of public employees are measured." *Tygrett v. Barry*, 627 F.2d 1279, 1282 (D.C. Cir. 1980); *see, e.g.*, *Lane v. Franks*, 134 S. Ct. 2369, 2377–78 (2014). First, a court must determine whether the employee spoke as a private citizen, addressing matters of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Orange v. District of Columbia*, 59 F.3d 1267, 1272 (D.C. Cir. 1995). Appellees do not contest that this prerequisite is satisfied. As the district court found, *Baumann III*, 987 F. Supp. 2d at 75–76, Baumann spoke as a union official, not as a police officer, when he disclosed the ERT recording, *see Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006). Further, his speech — releasing an ERT recording that he considered to reveal security risks to the public and MPD officers arising from the MPD's handling of barricade situations — was of public concern. *See Connick v. Myers*, 461 U.S. 138, 146 (1983); *O'Donnell*, 148 F.3d at 1133–34; *Sanjour*, 56 F.3d at 91. Second, if the "private citizen/public concern" requirement is met and *Pickering* applies, then the court "must 'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 465–66 (1995) (first alteration in original) (quoting *Pickering*, 391 U.S. at 568). In performing that balancing, "courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Sanjour*, 56 F.3d at 97; *see NTEU*, 513 U.S. at 474–75; *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996). "[T]he government bears the burden of justifying its adverse employment action . . . ." *NTEU*, 513 U.S. at 466. In particular, "when the [g]overnment defends a regulation on speech as a means to . . . prevent anticipated

harms, it . . . must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (internal quotation marks omitted). We conclude that appellees have met their burden for the following reasons.

It cannot be gainsaid that the MPD has a weighty interest in preserving confidential information that, if released publicly, could jeopardize the successful conclusion of a criminal investigation. *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1297 (10th Cir. 2009); *Swartzwelder v. McNeilly*, 297 F.3d 228, 239 (3d Cir. 2002) (Alito, J.); *Hanneman v. Breier*, 528 F.2d 750, 754 (7th Cir. 1976). Congress and the judiciary have recognized this and related interests in other contexts. In *Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007), the *en banc* court noted that "[t]here are many federal provisions that forbid individuals from disclosing information they have lawfully obtained," and "[t]he validity of these provisions has long been assumed." *Id.* "Grand jurors, court reporters, and prosecutors, for instance, may 'not disclose a matter occurring before the grand jury.'" *Id.* (quoting FED. R. CRIM. P. 6(e)(2)(B)). "Judicial employees may not reveal confidential information received in the course of their official duties." *Id.* (citing CODE OF CONDUCT FOR JUDICIAL EMPLOYEES CANON 3D). And the Freedom of Information Act protects from disclosure records relating to law enforcement investigations and proceedings. 5 U.S.C. § 552(b)(7).

Appellees have not argued that *Boehner* is dispositive here, or that Baumann's First Amendment challenge should be resolved without looking to his and the public's interests in disclosure. And it is unnecessary to decide whether Baumann's disclosure of confidential material relevant to pending investigations may be barred without consideration of those interests in disclosure. *See Boehner*, 484 F.3d at 579. Even

accepting the district court's determination that the disclosure addressed a matter of public concern, the MPD's interest in preventing the potential jeopardizing of ongoing investigations is strong enough to outweigh Baumann's and the public's pro-disclosure interests in immediate release of the ERT recording under *Pickering*. Baumann, as a police officer and union official, and the public have a strong interest in his speaking to the public about safety issues related to the MPD's management of barricade situations, *see Sanjour*, 56 F.3d at 94; *Baumann III*, 987 F. Supp. 2d at 77, and, aside from releasing the recording, Baumann and other officers were free to do so. But the MPD's "interest in protecting the integrity of [the] investigation[s]" by preventing the premature and unauthorized disclosure of the ERT's communications "clearly outweighed whatever interest [Baumann and the public] had in [his] disclosing [the ERT recording itself]" at the particular time he did. *Orange*, 59 F.3d at 1273; *see also Dixon*, 553 F.3d at 1306–09. That is, the public was not denied information about the barricade incident, as those who were present or otherwise informed of it were free to discuss it publicly, as they did, with the exception here that the recording of the ERT's communications was confidential during the pendency of related criminal investigations.

The ERT recording of the barricade incident falls squarely within the definition of confidential information that may jeopardize the successful conclusion of an investigation. As the name "Emergency Response Team" indicates, the ERT is a specialized tactical unit that responds to ongoing, highly dangerous, emergency law enforcement situations, and, as here, the ERT's recordings are often of communications among ERT members who are observing a violent crime in progress. Such recordings can reveal information about the location, nature, and timing of actions by the suspect and the police as well as of other individuals — including confederates and witnesses — at the scene. Premature release of such information can, among

other things, tip off potential suspects and others that the MPD has a contemporaneous recording of the events and thereby jeopardize the MPD's ability to use that recording to verify the accuracy and credibility of eyewitness testimony untainted by those witnesses having learned what is contained in the recordings. *Cf. Orange*, 59 F.3d at 1273. Also, of particular interest to Baumann, premature release of this ERT recording could have interfered with the MPD's efforts to resolve whether an order to use tear gas had been given, and if so, under what circumstances, as well as to find out whether high-ranking officials outside the chain of command had improperly interfered with the ERT's handling of the incident.

It is true, as Baumann emphasizes on appeal, that a government employer "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (internal quotation marks omitted); *accord Sanjour*, 56 F.3d at 98. But this does not require the government to "allow events to unfold to the extent that the disruption . . . is manifest before taking action." *Connick*, 461 U.S. at 152. That is, "a showing of actual disruptiveness is not required; a government employer is allowed to consider the potential disruptiveness of the employee's speech." *Lalowski v. City of Des Plaines*, — F.3d — , No. 12-3604, 2015 WL 3756412, at *6 (7th Cir. June 17, 2015) (internal quotation marks omitted). A recording of the ERT's communications during an incident involving MPD officers' exchanging gunfire with a suspect who barricaded himself inside a private home is manifestly the kind of information that would be significant in follow-up investigations, regardless of whether it ultimately proved to be decisive in resolving a critical issue or evaluating received evidence. Premature disclosure of the ERT recording "carrie[d] the clear potential for undermining" the ongoing investigations, *Connick*, 461 U.S. at 152, and thus endangered

the MPD's effective operations. *See id.* at 152–53. "We think it is sufficient in this case that . . . [appellees] established that the [recording's release] could very well have an unfavorable impact on the [ongoing investigations]." *Zook v. Brown*, 865 F.2d 887, 893 (7th Cir. 1989); *see Lalowski*, 2015 WL 3756412, at \*6; *Dixon*, 553 F.3d at 1306–07.

Baumann's suggestion that there is a material dispute about whether disclosure of the ERT recording might be harmful to the ongoing investigations lacks merit. He relies on Officer Charles Yarbaugh's testimony that release of the ERT recording would not be detrimental to any of the ERT's operations. This overlooks that Yarbaugh spoke only to whether the safety of the ERT officers would be jeopardized by release of the recording (e.g., by disclosing non-public tactical techniques or codes); he did not comment about whether such disclosure would affect the ongoing investigations of the barricade incident by tipping off potential witnesses about the content of the MPD's evidence. And ERT recordings like the one at issue are likely to be useful during related investigations because they frequently include officers' radio chatter describing the scene and the location of the suspect and confirm whether the police discharged their weapons before or after a suspect fired at them. Such information also can be used to gauge the credibility of testimony provided by the suspect, officers, and witnesses about the emergency situations the recordings memorialize, and may be of use in investigations relating to whether officers were justified in using force.

The General Order's restriction on Baumann's disclosure of the ERT recording is narrow and time-limited, with an obvious "'fit' between the government's purported interest" and the restriction. *See Sanjour*, 56 F.3d at 95. The Order lists many other kinds of information that may be publicly disclosed. *See* Gen. Order 204.01, Part VI-A & VI-B. Indeed, the MPD has

acknowledged that Baumann was only prohibited from releasing the ERT recording on his own initiative at the time he did and was free to talk with anyone in or outside of the MPD about the barricade situation even though the investigations were ongoing. *See* Appellees' Br. 46. The record makes clear he did so, when he told the safety committee to investigate, when he sent an email to Assistant Chiefs Durham and Burke, and when he spoke with a reporter about the barricade incident. Moreover, the restriction under Part VI-C-1 applies only to "[c]onfidential information that may jeopardize the successful conclusion of an investigation," which the MPD interprets to mean that it applies only while an investigation is ongoing. *See* Appellees' Br. 47. Baumann was at most only prohibited from releasing the ERT recording on his own initiative while the barricade-related investigations were pending. And he makes no claim that he alerted any MPD officials of his intention to disclose the ERT recording to the media, much less sought permission to release it only days after the barricade incident. Consequently, Part VI-C-1 of General Order 204.01 as applied to Baumann by the Chief of Police is tailored to the MPD's justifications for non-disclosure and does not unnecessarily burden Baumann's and the public's interests in speech about the barricade. *See Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004).

For these reasons, we conclude that the ERT recording was within the General Order's *ex ante* bar against disclosure of confidential information that may jeopardize ongoing investigations and that Baumann's sanction for disobeying that rule did not violate his First Amendment rights.

## III.

The DCWPA, D.C. Code § 1-615.51 *et seq.*, provides that "[a] supervisor shall not . . . retaliate against an employee because of the employee's protected disclosure." *Id.*

15

§ 1-615.53(a); *see Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C. 2008). To prove a violation of the DCWPA, an employee must demonstrate "by a preponderance of the evidence [1] that [he] made a protected disclosure, [2] that a supervisor retaliated or took or threatened to take a prohibited personnel action against [him], and [3] that [his] protected disclosure was a contributing factor to the retaliation or prohibited personnel action." *Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012) (internal quotation marks omitted). Pursuant to the DCWPA in effect at the time of the events underlying Baumann's lawsuit, the term "protected disclosure" means

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences: (A) [g]ross mismanagement; (B) [g]ross misuse or waste of public resources or funds; (C) [a]buse of authority in connection with the administration of a public program or the execution of a public contract; (D) [a] violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or (E) [a] substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6) (2001); *see Payne v. D.C. Gov't*, 722 F.3d 345, 350 (D.C. Cir. 2013). A "supervisor" is "an individual employed by the District government," D.C. Code § 1-615.52(a)(8) (2001), who has the authority "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to evaluate their performance, or to adjust their grievances, or effectively to recommend such action, if . . . the exercise of

[such] authority . . . requires the use of independent judgment," *id.* § 1-617.01(d); *see id.* § 1-615.52(a)(8), or who has the authority "to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources that an employee may allege or report pursuant to this section, including without limitation an agency head, department director, or manager," *id.* § 1-615.52(a)(8). The term "[p]ublic body" includes "[a]ny federal, District of Columbia, state, or local law enforcement agency, prosecutorial office, or police or peace officer," as well as "[a]ny federal, District of Columbia, state, or local regulatory, administrative, or public agency or authority or instrumentality of one of these agencies or authorities." *Id.* § 1-615.52(a)(7)(C)–(D).

On appeal, Baumann points to three alleged protected disclosures under the DCWPA: (1) his request that Cunningham initiate a safety committee investigation of the barricade; (2) in his June 11, 2009 email to MPD officials; and (3) his statements during his two interviews with the IAD. *Baumann II*, 933 F. Supp. 2d at 30. With respect to Baumann's allegation that he made a protected disclosure by relaying the dangerous actions at the barricade to Cunningham and the safety committee and ordering the initiation of a safety committee investigation, Baumann did not disclose any safety issues to Cunningham; it was Cunningham who alerted Baumann to the concerns related to the barricade. Moreover, the union's safety committee is not a public body under the DCWPA because it consists entirely of union officials, and it is not a "supervisor" because, even if it had the "authority to effectively recommend . . . remedial or corrective action" to the MPD, it is not "an individual employed by the District government," D.C. Code § 1-615.52(a)(8) (2001). Finally, although Baumann testified at a D.C. Public Employee Relations Board ("PERB") hearing that the union's committee is the *de facto* joint safety committee — a committee provided

for by the CBA and comprised of three individuals appointed by MPD management and three individuals appointed by the union — he acknowledged that there were no MPD representatives on the committee and that the MPD had never convened a joint committee meeting. Baumann has not explained how a committee comprised entirely of union officials is a District agency or an "instrumentality" of the MPD. *See Baumann II*, 933 F. Supp. 2d at 31–32.

Baumann's June 11, 2009 email to Assistant Chiefs Durham and Burke was not a "protected disclosure" because Baumann did not disclose any safety concerns but rather re-sent an email to those who had already received it, without adding any information about the barricade that was not, according to Baumann, already known to the media. In opposing summary judgment, Baumann acknowledged that he "started receiving calls from the media on Sunday," May 31, 2009, about the barricade incident — specifically regarding "concerns about the command structure there," the involvement of hostage negotiators even though their unit had recently been disbanded, and a possible "order to deploy gas." Ex. 2 to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., PERB Hr'g Tr. 1471–73 (Feb. 23, 2010). As the D.C. Court of Appeals has held, the disclosure of information about which there is "public knowledge" and "vocalized public concern" is not protected under the DCWPA in effect at the time of the underlying events here. *Williams v. District of Columbia*, 9 A.3d 484, 489 (D.C. 2010). The now-amended statute, *see* Whistleblower Protection Amendment Act of 2009, D.C. Law 18-117 (Mar. 11, 2010), 57 D.C. Reg. 896 (Jan. 22, 2010); 57 D.C. Reg. 3,150 (Apr. 16, 2010), protects the disclosure of information without regard to the "prior disclosure made to any person by an employee." D.C. Code § 1-615.52(a)(6) (2010). But even assuming it encompasses Baumann's disclosure, that amendment does not apply retroactively, *see Payne*, 722 F.3d at 352–53. Moreover,

Baumann does not maintain that violations of the CBA fall within the scope of § 1-615.52(a)(6)(D) (2001), and his comments in the email about violations of law are insufficient to render the email a protected disclosure. His failure in the email, in the district court, and in his briefs on appeal to point to a specific law, rule, or regulation that was violated is fatal to his claim. *See District of Columbia v. Poindexter*, 104 A.3d 848, 858 (D.C. 2014) (citing *Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001)).

Finally, in Baumann's first IAD interview he refused to answer questions about the barricade incident or the recording and did not disclose anything, and with respect to the second interview, he has not identified what previously undisclosed safety concerns he revealed to the IAD. The issues Baumann discussed in the second interview — namely, the role played by a recently disbanded team of hostage negotiators and the alleged order to use tear gas — were, as Baumann acknowledged, *see, e.g.*, Ex. 2 to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., PERB Hr'g Tr. 1471–73 (Feb. 23, 2010), already known to the media. So their alleged disclosure was not protected under the then-extant DCWPA. *See Williams*, 9 A.3d at 489–90. And, again, to the extent an amendment to the DCWPA might protect them, *see* D.C. Code § 1-615.52(a)(6) (2010), it is not retroactive. *See Payne*, 722 F.3d at 352–53.

Because Baumann did not show that he made a "protected disclosure," his DCWPA claim against the individual appellees and the MPD fails, and we affirm the judgment for appellees on Baumann's statutory claim. Consequently, we do not reach the questions whether individual supervisors were subject to suit under the Act as originally enacted and whether the amendment providing for such liability applies retroactively.

Accordingly, we affirm the judgment of the district court.